**Christopher J. Kayser OSB No. 984244**
cjkayser@larkinsvacura.com
**John Rake OSB No. 105808**
jrake@larkinsvacura.com
**LARKINS VACURA LLP**
121 S.W. Morrison St., Suite 700
Portland, Oregon 97204
Telephone:  503-222-4424
Facsimile:  503-827-7600

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

|  |  |
|---|---|
| **HOSIE KENNETH RILEY**,<br>　　　　Plaintiff,<br><br>　　　vs.<br><br>**GALENA BIOPHARMA, INC.; THE DREAM TEAM GROUP, LLC; MISSION INVESTOR RELATIONS, LLC; LIDINGO HOLDINGS, LLC; MICHAEL ANDREW MCCARTHY; THOMAS MEYER; KAMILLA BJORLIN** (a/k/a Milla Bjorn)**; MARK J. AHN; RYAN M. DUNLAP; REMY BERNARDA; STEVEN KRIEGSMAN; RICHARD CHIN; STEPHEN S. GALLIKER; RUDOLPH NISI; SANFORD J. HILLSBERG**; and **MARK SCHWARTZ**,<br>　　　　Defendants. | Case No._____<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Page 1 – COMPLAINT

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................. 4

II. JURISDICTION AND VENUE............................................................................ 8

III. PARTIES ........................................................................................................... 9

   A.    Plaintiff Riley............................................................................................. 9

   B.    Company Defendant. ............................................................................... 10

   C.    DreamTeam Defendants. ......................................................................... 10

   D.    Lidingo Defendants.................................................................................. 11

   E.    Galena Officer Defendants. ..................................................................... 12

   F.    Galena Director Defendants...................................................................... 13

   G.    Insider Trading Defendants...................................................................... 14

IV. BACKGROUND ............................................................................................... 14

   A.    Company Background. ............................................................................. 14

   B.    Background on biopharmaceutical stock and catalysts. ........................... 15

   C.    Galena's catalysts.................................................................................... 19

V. DEFENDANTS' MISCONDUCT ....................................................................... 21

   A.    The Scheme to Pump Up the Price of Galena's Stock.................................... 21

       i.  Galena retains Lidingo and DreamTeam to boost Galena's stock price............................ 21

       ii. Galena reviews and approves articles for publication on important investor websites that contain materially false statements and omissions ............................................................. 25

       iii.    Defendants make materially false statements and/or omissions in promotional articles, SEC filings, press releases, and public statements................................................... 30

   B.    The Scheme to Dump Galena's Inflated Stock........................................... 43

       i.  Galena board awards an unprecedented and lavish amount of stock options to insiders . 43

       ii. Galena insiders sell off more than $16 million in Galena shares in January 2014, with six out of seven insiders selling at least 87% of their shares..................................................... 45

       iii.    Defendants' market manipulation scheme to pump up the price of Galena's stock is uncovered ...................................................................................................................... 50

   C.    Additional facts showing Defendants' false statements were material. ....................... 57

       i.  Galena has a long-standing relationship with both Lidingo and DreamTeam, and has timed its stock offerings to coincide with their illicit stock promotions............................... 57

       ii. Defendants' fraudulent promotion causes soul-searching in the investment community  59

   D.    Additional facts probative of scienter. ..................................................... 61

       i.  Galena Officer Defendants, Lidingo Defendants, and DreamTeam Defendants understood that the stock promotion campaign violated the securities laws............................ 61

ii. While the stock promotion scandal unfolds, Galena Officer Defendants repeatedly lie to investors, and Ahn is fired for cause .................................................................................. 64

iii.    Kriegsman had knowledge of DreamTeam's practices and retained DreamTeam for similar stock manipulation campaigns .................................................................................. 72

iv.    Galliker and Chin have knowledge of DreamTeam's practices and as officers of a biotech company retained DreamTeam to perform similar stock manipulation campaigns  73

v. Galena so values and tracks investor website Seeking Alpha that it sues over comments and articles posted on Seeking Alpha .................................................................................. 74

vi.    Additional facts probative of the liability of the Galena Director Defendants and Insider Trading Defendants.......................................................................................................... 75

vii.    Loss causation is established with regard to claims against Insider Trading Defendants .............................................................................................................................. 78

E.    Respondeat superior and agency principles impute liability to the various entities for the actions of the entity's employees and agents. ................................................................... 79

VI. RILEY RELIED UPON DEFENDANTS' FALSE AND MISLEADING STATEMENTS, OMISSIONS, AND MARKET MANIPULATION SCHEME ................................................... 82

A.    Fraud on the Market creates a presumption of reliance. ............................................... 82

B.    Riley's individual reliance on defendants' market manipulations and fraudulent statements................................................................................................................................ 84

VII. DEFENDANTS' CONDUCT CAUSED RILEY'S LOSSES ............................................ 86

VIII. RILEY'S LAWSUIT IS TIMELY.................................................................................. 86

IX. THE STATUTORY SAFE HARBOR DOES NOT APPLY ............................................. 87

X. CLAIMS......................................................................................................................... 88

Plaintiff Dr. Hosie Kenneth Riley, individually, through his attorneys, alleges the following based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.  Plaintiff's information and belief as to allegations concerning matters other than himself and his own acts is based upon his counsel's review and analysis of, among other things: (i) documents filed publicly by Galena Biopharma, Inc. ("Galena") with the United States Securities and Exchange Commission (the "SEC"); (ii) press releases, new articles, and other public statements issued by or concerning Galena and its representatives, co-promoters, and affiliates; (iii) research reports issued by financial analysts concerning Galena's securities and business; (iv) information concerning investigations by governmental agencies; (v)

information concerning the status of Galena's business before regulatory authorities, including the Food and Drug Administration ("FDA"); (vi) records made available by Galena's Special Committee from its investigation into the "2012-2014 Market Visibility Campaigns and the Sales by Insiders in the First Quarter of 2014" (vii) records and information disclosed in other litigations naming Galena and its officers and directors as defendants or nominal defendants, including the action captioned *In Re Galena Biopharma, Inc. Securities Litigation*, Case No. 3:14-cv-00367-SI.  Plaintiff believes that substantial additional evidentiary support for the allegations herein exists and will continue to be revealed after Plaintiff has a reasonable opportunity to conduct discovery.

## I. INTRODUCTION

1.      This is an action brought by an investor, Plaintiff Hosie Kenneth Riley ("Riley"), against Defendant Galena Biopharma, Inc. ("Galena"), several of its officers and directors, Galena's investor relations firms and related persons, for violations of securities laws taking place between August 6, 2013, and May 14, 2014 (the "Relevant Period"), that have caused damages to Riley.

2.      Galena is a biopharmaceutical company purportedly focusing on the development and commercialization of targeted oncology treatments that address major unmet medical needs to advance cancer care.  Galena is pursuing development of cancer therapeutics, including its main product candidate, NeuVax™, for the treatment of breast cancer and other tumors.  More specifically, Galena has promoted NeuVax™ specifically to prevent or delay the recurrence of breast cancer.

3.      By early 2013, analysts were beginning to question NeuVax™.  Galena's share price had dropped from a high of about $7.70 per share in 2010 to under $2 per share at the beginning of 2013.

Page 4 – COMPLAINT

4.     Galena and certain of its officers and directors engaged in a stock promotion scheme designed to inflate the price of Galena securities (the "pump") in order to sell Galena shares for personal profits of over $16 million dollars (the "dump").   Galena and its executives were the scheme's primary architects, along with their agents, the Dream Team Group, LLC ("DreamTeam"), Lidingo Holdings, LLC ("Lidingo"), and DreamTeam's and Lidingo's executives and agents.

5.     Beginning in or around July and August 2013, respectively, Galena entered into contracts with DreamTeam and Lidingo to promote Galena stock.  Galena's contract with Lidingo included stock options that created a motive for Lidingo to manipulate Galena stock.

6.     As part of these agreements, DreamTeam touted Galena stock by publishing bullish articles about Galena on third-party websites.  The articles were designed to publicize Galena's "catalysts," in order to stimulate investor interest and increase stock price.  For a biopharmaceutical company that produces oncology treatments like Galena, key catalysts include the passage of milestones on the way to approval by the Food & Drug Administration ("FDA").

7.     The DreamTeam articles, which were reviewed and approved by Galena, falsely claimed to have been written by sophisticated investors, and most articles went further by stating that they were not paid promotions.  Many of the articles were written under aliases masquerading as Galena investors, some with extensive industry experience.  Galena's paid promoters (DreamTeam and Lidingo) sent email blasts containing links to the articles to investors, posted links to the articles on other blogs and online message boards, posted responses to the articles that further promoted purchasing Galena stock, and posted replies to negative messages about Galena.  The end result of Galena and its paid promoters' efforts was the creation of a positive feedback loop of Galena information in which investors were made to feel

Page 5 – COMPLAINT

that the analysis posted on third-party websites by Galena's agents was correct, and that there was a deep market for Galena stock.

8.     The market, and investors like Riley who paid close attention to Galena, did not know that the articles at the core of the scheme ultimately were reviewed, approved, and funded by Galena's executives, namely CEO Mark Ahn and VP Remy Bernarda.  That is because Galena required that the articles falsely stated that the authors were not paid for writing the articles.

9.     The scheme to manipulate its stock was not limited to articles, message boards, and email blasts in which Galena, DreamTeam, and Lidingo (and each entity's officers and agents) misled the marketplace regarding the origins, review, and payment for the articles.

10.    In Galena's own SEC filings, Galena falsely represented that it was not manipulating the price of Galena securities, and made material omissions by not disclosing its stock promotion agreements with DreamTeam and Lidingo or its role in reviewing and approving the articles posted to third-party websites and promoted across the Internet in social media and on message boards.

11.    Galena made additional false statements and omissions in SEC filings regarding stock catalysts.  For example, in its Form 10-Q for the third quarter of 2013, Galena stated that its Phase 3 study of NeuVax™ was further along than it actually was, with 700 patients currently enrolled.  As another example, in a Form 10-K filing published in March 2014 Galena omitted the receipt of the FDA's denial of a "Breakthrough Therapy" designation for NeuVax™ dated December 23, 2013, and instead described the significance of the FDA's conferral of accelerated approval, including the "Breakthrough Therapy" designation for a therapeutic treatment.

Galena's 10-K thus falsely suggested that NeuVax™ was still a candidate for accelerated approval, despite its receipt of the FDA's denial letter.

12.     Galena's executives, most notably CEO Mark Ahn, made additional false statements and omissions in public statements regarding catalysts for Galena stock.  For example, in a January 16, 2014, interview on CNBC's "Mad Money" hosted by Jim Cramer, Ahn made false statements about Phase 3 enrollment figures, the progress of the Phase 3, and the market potential for NeuVax™.  Defendant Ahn made similar statements and omissions in an interview published on SeekingAlpha.com on February 4, 2014.  These statements and omissions were not corrected in an open letter to shareholders dated February 14, 2014.

13.     The manipulative and deceptive scheme succeeded in raising the price of Galena's stock.  Galena's stock price rose from about $2/share in 2013 to $7.48/share on January 16, 2014, its highest level in four years.

14.     With Galena stock at its zenith as a result of the "pump," Galena insiders began "dumping" Galena stock for incredible profits.  Beginning on January 17, 2014, certain Galena executives and directors, who (1) received an unprecedented award of stock options just two months earlier, (2) knew about the paid stock promotion campaigns with DreamTeam and Lidingo, (3) knew non-public information regarding Galena's 2013 revenue, (4) knew non-public information about the real enrollment figures for the Phase 3 of NeuVax™, (5) knew non-public information about the FDA's denial of a breakthrough designation for NeuVax™, began dumping their shares, for a combined total of more than $16 million.  Six of the selling insiders sold between 87 and 100 percent of their Galena shares, with the seventh insider selling 19.6% of his shares.

15.    The pump and dump scheme began to unravel when, among other things, analysts noticed the huge insider sales and whistleblowers exposed the illicit stock manipulation and relationships between Galena and DreamTeam (and later, Galena and Lidingo).  But even as investors following Galena stock began to question both whether Galena was illegally manipulating its stock price using shady investor relations firms and whether insiders were dumping shares, Galena and CEO Ahn denied the allegations and doubled down on previous statements about the strength of Galena's stock and accuracy of previous statements about Galena catalysts.  Notwithstanding these denials, the SEC announced its investigation of Galena in mid-February 2014, and Galena subsequently announced an internal investigation by a Special Committee.  With each disclosure, the price of Galena stock declined.  By Galena's release of conclusions from the internal investigation of a special committee, in September 2014, the stock had deflated to $2.12/share when the market closed.

16.    Riley, an investor in Galena stock, suffered significant economic losses as a result of his reliance on defendants' false statements and omissions.  Tracking the articles on Galena on third-party websites and Galena's public filings and statements at health conferences, in conference calls with investors, and through common investor media outlets, such as Mad Money, and timing his purchases of Galena stock and stock options based on the false and misleading statements and omissions contained therein, Riley took a "long" position in Galena.  As a result of defendants' manipulations of Galena stock, misstatements, and omissions, Riley lost over $1.1 million, which is the basis for this lawsuit.

## II.  JURISDICTION AND VENUE

17.    The claims asserted in this action arise under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

18.     This court has subject matter jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

19.     Venue is proper in this district court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because Galena's principal executive offices are located in this district, Galena conducts business in this district, and many of the acts complained of in this Complaint have occurred in substantial part in this district.  The false and misleading public statements made by various defendants were transmitted into this district, and, in many instances, were made in this district.

20.     In connection with the acts and conduct alleged in this Complaint, defendants directly or indirectly and used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the interstate securities markets.

### III. PARTIES

**A.  Plaintiff Riley.**

21.     Plaintiff Hosie Kenneth Riley ("Riley") is an individual who resides in Osprey, Florida.  Riley received a Bachelor of Science in Biology from Stanford University in 1977 and a Medical Doctor degree from Duke University School of Medicine in 1981.  After a residency in Diagnostic Radiology at Duke University Medical Center from 1980 to 1984 and a fellowship in Neuro-Magnetic Imaging at the University of Texas Health Science Center of Dallas, Texas, Riley has maintained a clinical practice.  Since 2004 Riley has served as the Medical Director in the Department of Radiology at Bayfront Port Charlotte and Bayfront Punta Gorda in South Florida.

22.     In his clinical practice, Riley has participated in multidisciplinary tumor board conferences on the management of patients with various forms of cancer, including breast

cancer.  Because of his medical background and interest in cancer research, Riley has followed

with interest biopharmaceutical research and development, including research and development

into targeted cancer treatments and immunotherapy products such as NeuVax™.

23.    Riley purchased Galena common stock and "put" options during the Relevant

Period and suffered damages as a result of the violations alleged in this Complaint.

**B.  Company Defendant.**

24.    Defendant Galena Biopharma, Inc. ("Galena") is a biopharmaceutical corporation

whose principal executive offices are in Lake Oswego, Oregon.  Galena's stock is listed and

actively traded on the NASDAQ with the ticker "GALE."  Galena originally was incorporated as

Argonaut Pharmaceuticals, Inc., in Delaware on April 3, 2006, and changed its name to RXi

Pharmaceuticals, Inc., on November 28, 2006.  On September 26, 2011, RXi Pharmaceuticals

changed its name to Galena Biopharma, Inc.

**C.  DreamTeam Defendants.**

25.    Defendant The Dream Team Group, LLC, a/k/a DreamTeamNetwork

("DreamTeam") purports to be an investor relations, public relations, and social media relations

firm.  DreamTeam uses a number of affiliates, including Mission IR, discussed below.

DreamTeam is organized in Florida and has its corporate headquarters in Indiana.  However,

based on information obtained from filings from *In Re Galena Biopharma, Inc. Securities

Litigation*, Case No.: 3:14-cv-00367-SI, the addresses used by DreamTeam and its principals,

including addresses in Indiana and Texas, are actually post office boxes located at UPS Stores.

26.    Defendant Mission IR a/k/a Mission Investor Relations, LLC, ("Mission IR")

purports to be an "affiliate network partner" of Dream Team.  Mission IR is the entity that

contracted with Galena to tout Galena's stock.  Mission IR itself speaks in many voices;

according to its website, it has approximately 15 partners or affiliates.  Mission IR purports to have an address at 3645 Marketplace Blvd. Suite 130-280, Atlanta, GA 30344.

27.     Defendant Michael Andrew McCarthy was and is DreamTeam's managing member and corresponded frequently with Galena officers, namely Ahn and Bernarda. McCarthy also identifies himself as the managing director of DreamTeam affiliates, including MissionIR.  McCarthy purports to have a domicile in Texas.

28.     Defendant Thomas Meyer works for DreamTeam.  During the Relevant Period, Meyer published bullish articles touting Galena stock under his own name and under false aliases.

29.     Galena's relationship with DreamTeam and its affiliates dates back to October 2008, when DreamTeam contracted with Galena to start posting positive articles about Galena on DreamTeam affiliate blogs.

30.     Collectively, Mission IR, McCarthy, Meyer, and DreamTeam are referred to as the "DreamTeam Defendants."

**D.  Lidingo Defendants.**

31.     Defendant Lidingo Holdings LLC ("Lidingo") is a dissolved Nevada company that contracted with Galena to tout Galena stock.  A Special Committee appointed by Galena's board found that Lidingo paid bloggers to write promotional articles about Galena.  Based on information obtained from filings from *In Re Galena Biopharma, Inc. Securities Litigation*, Case No.: 3:14-cv-00367-SI, the addresses used by Lidingo and its principals, including those in Nevada and California, are sham addresses.

32.     Kamilla Bjorlin aka Milla Bjorn ("Bjorlin") was the principal or managing member of Lidingo during the Relevant Period.  Bjorlin corresponded frequently with Galena

officers, namely Ahn, Bernarda, and Dunlap.  Such correspondence frequently referred to her as Milla Bjorn.

33.     Galena's relationship with Lidingo dates back to at least January 2012.

34.     Collectively, Bjorlin and Lidingo are referred to as the "Lidingo Defendants."

**E.  Galena Officer Defendants.**

35.     Defendant Mark J. Ahn was appointed as a director of Galena's predecessor in 2007, and was appointed Galena's President and CEO in March 2011.  Ahn remained in these positions until his termination for cause on August 21, 2014, for his role in the events described in this Complaint.  Prior to his association with Galena, Ahn founded Hana Biosciences in 2002, and remained its CEO until August 2007.

36.     Defendant Ryan M. Dunlap currently serves as Galena's Vice President, Chief Financial Officer.  Dunlap was appointed as Galena's Director of Finance, Controller, and corporate Secretary, in July 2012.  In July 2014, he was promoted to Senior Director, Finance, and Chief Accounting Officer.  On or before January 29, 2014, Dunlap became Galena's Chief Financial Officer.  Dunlap attended Galena board meetings in October 2013 and January 2014 at which the company's marketing and promotional campaigns were discussed.  At the time, more than 90 percent of Galena's investor relations expenses were payments to DreamTeam and Lidingo.

37.     Defendant Remy Bernarda currently serves as Galena's Senior Vice President, Investor Relations & Corporate Communications.  Bernarda is responsible for Galena's Investor and Public Relations and Marketing for its pipeline products.  Between May 2006 and September 2008, Bernarda was the associate director of investor relations of Ahn-founded Hana Biosciences.  Prior to her employment with Galena, Bernarda provided services to Galena in her

role as Vice President at IR Sense, LLC, which provides outsourced investor relations services. Between June 2008 and June 2012, Bernarda served as a director of the National Investor Relations Institute's Silicon Valley Chapter.

38.    Collectively, Ahn, Dunlap, and Bernarda are referred to as the "Galena Officer Defendants."

### F.  Galena Director Defendants.

39.    Defendant Steven Kriegsman has served on Galena's board since 2006, and he has served as chairman of its Compensation Committee since 2007.  Kriegsman has been a director and the President and Chief Executive Officer of CytRx Corporation since July 2002, which is Galena's former parent company.  CytRx also was a DreamTeam client.

40.    Defendant Richard Chin has served on Galena's board since 2009, and has served on its Compensation Committee since 2011.  Chin also is a co-founder of Kindred Biosciences, Inc., a development-stage pet prescription drug company, and has been its President and Chief Executive Officer since October 2012.  Kindred Biosciences also was a DreamTeam client.

41.    Defendant Stephen S. Galliker has served on Galena's board since 2007, and served on its Compensation Committee between 2007 and 2010.  Galliker also works as Chief Financial Officer of Kindred Biosciences.

42.    Defendant Rudolph Nisi has served on Galena's board since January 2009, and has served on its Compensation Committee since 2009.

43.    Defendant Sanford J. Hillsberg has served as chairman of Galena's board since 2007.  Hillsberg has been an attorney with TroyGould PC since 1976 and is a member of the firm's Management Committee. Hillsberg was a founder and until December 2007, served as a director and Secretary of ImmunoCellular Therapeutics, Ltd., a publicly-held clinical-stage

biotechnology company. Hillsberg introduced Ahn to the work of the Lidingo Defendants based on a recommendation from another executive.

44.     Collectively Kriegsman, Chin, Galliker, Nisi, and Hillsberg are referred to as the "Galena Director Defendants."

45.     Collectively the Galena Director Defendants, Galena Officer Defendants, and Galena are referred to as the "Galena Defendants."

**G. Insider Trading Defendants.**

46.     Defendant Mark Schwartz is currently President and Chief Executive Officer of Galena. Schwartz was appointed to these positions in 2014 after Galena terminated Ahn. Prior to his appointment to President and CEO, Schwarz was Galena's Executive Vice President and Chief Operating Officer. Schwartz previously served as President and CEO of Apthera, Inc., a company that Galena acquired in 2011.

47.     Schwartz regularly attended Galena board meetings, including the Galena board meetings held on October 11, 2013, and January 16, 2014.

48.     Collectively, Ahn, Kriegsman, Chin, Galliker, Nisi, Hillsberg, and Schwartz are referred to as the "Insider Trading Defendants."

**IV. BACKGROUND**

**A. Company Background.**

49.     Galena, formerly known as RXi Pharmaceuticals Corporation, spun off from its parent, CytRx Corporation, in January 2007. CytRx remained the majority owner of Galena until February 2008. Kriegsman, CytRx's CEO, remained a director of Galena after the spinoff.

50.     At all relevant times, Galena was a small company. As of March 2013, Galena employed 12 employees, and as of March 2014, Galena employed 60 employees.

51.     In April 2011, Galena acquired Apthera, Inc., a private biotechnology company located in Oregon.  In connection with this acquisition, Defendant Ahn became CEO of Galena, as well as a director.

52.     In September 2011, Galena announced that it would separate into two companies: RXi, which would focus on developing RNA-i-based therapeutics, and Galena, which would focus on developing targeted cancer therapies.  Ahn remained Galena's CEO.  Galena's board at the time consisted of Defendants Ahn, Kriegsman, Hillsberg, Chin, Galliker, and Nisi.

53.     Galena states that its clinical and commercial strategy focuses on identifying and advancing therapeutic opportunities to improve cancer care, from direct treatment of the disease to the reduction of its debilitating side-effects.

54.     More specifically, Galena states it is developing peptide vaccine (off-the-shelf) cancer immunotherapies, which address major patient populations of cancer survivors to prevent recurrence of their cancers. These therapies are intended to work by harnessing the patient's own immune system to seek out and attack any residual cancer cells. Galena states that using peptide immunogens has many clinical advantages, including an excellent safety profile, as these drugs lack the toxicities typical of most cancer therapies. They also evoke long-lasting protection through immune system activation and convenient mode of delivery.

**B.  Background on biopharmaceutical stock and catalysts.**

55.     The long-term profitability of a biopharmaceutical company like Galena depends in large part upon sales revenue from marketable drugs (that already have received FDA approval), which can then fund a new pipeline of drugs (that have not yet received FDA approval).  Most companies are unprofitable until they are able to get a drug approved by the FDA and then commercialize it.  Until that point (commercialization of the drug), the

biopharmaceutical company must raise significant funds, which are spent on intellectual property protections, clinical trials, and other cost centers.

56.     Like many other biopharmaceutical or biotech stocks, Galena's stock value rises and falls in large part due to key "catalysts," including news about (a) new drugs in the company's developmental pipeline, (b) intellectual property acquisition and protection (e.g., successfully obtaining patent protections for a particular jurisdiction), (c) the passage of milestones in the FDA approval pipeline (discussed in detail in paragraph 57 below), (d) regulatory announcements regarding the drugs in development, (e) strategic development partnerships (regarding, for example, the distribution of a drug in a different country or market), and (f) sales revenue from marketable drugs.  In various filings with the SEC, Galena labels these catalysts as "risk factors" that can affect the market price and trading volume of Galena's stock.

57.     A biopharmaceutical company that is sponsoring a new drug must overcome a number of obstacles in order to obtain FDA approval for an investigational drug.  In general, these obstacles include the following:

a)  Clinical trials may only begin after an investigation drug is reviewed by the FDA and a local institutional review board, a panel of scientists and non-scientists in hospitals and research institutions that oversee clinical research.  The institutional review board must approve clinical trial protocols that describe the type of people who may participate in the clinical trial, the schedule of tests and procedures, the medications and dosages to be studied, the length of the study, the study's objectives, and other details.

b) Phase 1 studies are usually conducted in healthy volunteers. The goal of Phase 1 is to determine what the drug's most frequent side effects are and, often, how the drug is metabolized and excreted. The number of subjects typically ranges from 20 to 80.

c) Phase 2 studies begin if Phase 1 studies do not reveal unacceptable toxicity. While the emphasis in Phase 1 is on safety, the emphasis in Phase 2 is on effectiveness. This phase aims to obtain preliminary data on whether the drug works in people who have a certain disease or condition. For controlled trials, patients receiving the drug are compared with similar patients receiving a different treatment--usually an inactive substance (placebo), or a different drug. Safety continues to be evaluated, and short-term side effects are studied. Typically, the number of subjects in Phase 2 studies ranges from a few dozen to about 300.  At the end of Phase 2, the drug sponsor and the FDA frequently discuss how large-scale studies in Phase 3 will be conducted.

d) Phase 3 studies begin if evidence of effectiveness is shown in Phase 2. These studies gather more information about safety and effectiveness, studying different populations and different dosages and using the drug in combination with other drugs. The number of subjects usually ranges from several hundred to about 3,000 people.  At any time during a Phase 3 trial, the drug can be submitted for an accelerated approval which can significantly shorten the time to FDA approval and eliminate a lot of cost from the trial research.  These accelerated programs are intended to facilitate and expedite development and review of new drugs to address unmet medical need in the treatment of serious or life-threatening conditions.  These programs include, among others, "Fast Track" and "Breakthrough Therapy" designations.   Fast Track designation is for a drug that (a) is intended to treat a serious condition and for which nonclinical or clinical data

demonstrate the potential to address unmet medical need, or (b) a drug that has been

designate as a qualified infections disease product. Breakthrough Therapy designation is

for a drug that is intended to treat a serious condition and preliminary clinical evidence

indicates that the drug may demonstrate substantial improvement on a clinically

significant endpoint over available therapies.  Achieving a Fast Track or Breakthrough

designation would be a major catalyst for a drug sponsor.

e)  After a successful Phase 3 study, it is common for the drug sponsor to meet with the
FDA, before submitting a New Drug Application formally asking the FDA to consider a
drug for marketing approval.

f)  In addition to reviewing the New Drug Application, the FDA reviews the sponsor's
research on the drug's safety and effectiveness, the information on the drug's
professional labeling, and the drug's manufacturing facilities.

58.    Completing the enrollment of patients for a Phase 3 clinical trial can be time-

consuming and expensive.  Recent data from Forbes suggests that in many cases, companies

spend more than 90% of their development money per drug on Phase 3 clinical trials.   As a

result, timely completion of Phase 3 enrollment is a major catalyst for a biopharmaceutical

company such as Galena, because it demonstrates, among other things, that (a) the company is

committed to the investigational drug and has the resources and funding it needs to see the

project through, and (b) the clinical trial team(s) accept and trust the drug's potential

effectiveness and safety profile enough to recruit patients into the trial.

59.    A drug sponsor's costs go down dramatically after Phase 3 enrollment is complete

and the focus of the trial becomes maintenance and observation of the trial.  At this point, the

cash position of a company becomes more concrete and a better predictor of the financial health

and potential of the company.  This can lead to greater access to capital from investors and a greater likelihood of a buy-out from a bigger company that can multiply stock value for early investors.

60.    Timely enrollment of Phase 3 participants also paves the way for an "interim analysis" of the Phase 3 trial.  An interim analysis, conducted by a Data Monitoring Committee (or Data and Safety Monitoring Committee), provides an early look at whether the investigation drug is effective and safe.  A positive interim analysis can boost stock value and the likelihood of a buy-out, as it acts as a predictor of whether the drug may attain FDA approval, and how soon the approval may occur.

**C.  Galena's catalysts.**

61.    Galena's 2012 year-end results demonstrated continuing losses of $21.2 million, nearly twice the losses from 2011, which were $11.4 million.

62.    A significant portion of Galena's spending (and resulting losses) was attributable to research and development of NeuVax™, the lead immunotherapy product in Galena's product pipeline.  The FDA has not yet approved NeuVax™ for widespread use, but the FDA has allowed it to be used in limited clinical trials to study its effectiveness and safety.

63.    In March 2013, Galena announced that it had entered into an agreement with Orexo AB, an emerging specialty pharmaceutical company based in Sweden, to acquire Abstral® (fentanyl) Sublingual Tablets[1] for sale and distribution in the United States.  Galena proclaimed that the acquisition and resulting distribution and sales of Abstral® would bring

---

[1] Abstral®, a proprietary form of the opiate analgesic fentanyl, is used to treat "breakthrough" cancer pain (sudden episodes of pain that occur despite regular, around-the-clock treatment with pain medication).  Fentanyl is a Schedule II controlled substance with abuse liability similar to other opioid analgesics. Fentanyl is 50 to 100 times more potent than morphine, according to the Director of the National Institute on Drug Abuse, Dr. Nora D. Volkow, and is connected with numerous overdoses and deaths.

revenues to the Company in 2014 to support the development of Galena's pipeline, namely its development of NeuVax™.

64.    Galena launched Abstral® sales in the fourth quarter of 2013, but when Galena announced its 2013 results, it admitted that Galena had "only recently initiated our product launch of Abstral, our only approved product.  We have a history of net losses and negative cash flows from operation and have not sold any other products, and cannot predict if or when we will become profitable. . . . We are unable to predict when, if ever, that we will generate profits from the sale of Abstral."

65.    The Phase 3 study for NeuVax™ began in 2011 and is being conducted under a Special Protocol Assessment[2] (SPA) granted by the FDA.  The title of the Phase 3 study is Prevention of Recurrence in Early-Stage, Node-Positive Breast Cancer With Low to Intermediate HER2 Expressions With NeuVax™ Treatment ("PRESENT").  The estimated enrollment for the Phase 3 is 700 patients.  An interim analysis will be performed after 70 events.

66.    Key catalysts for Galena's stock value include (a) announcements related to milestones in NeuVax's PRESENT trial, most notably the completion of enrollment, which could lead to an interim analysis, (b) other regulatory announcements regarding NeuVax™, including approval or denial of any accelerated designation request (such as Breakthrough Therapy or Fast Track designation), (c) any announcements related to strategic partnerships for NeuVax™ development or market potential, (d) any announcements related to Galena's

---

[2] A Special Protocol Assessment, in essence, is an FDA statement that a Phase 3 trial's design, clinical endpoints, and statistical analyses are acceptable for FDA approval.  A drug sponsor can request an SPA to get the FDA's views on the trial design for its experimental medicine. When the FDA formally endorses a SPA, it essentially endorses the protocol thereby giving a company confidence that, if the drug performs as hoped, the FDA will readily approve it.

acquisition of other marketable products, (e) any announcements related to revenue/earnings from marketable drugs, such as Abstral®.

## V. DEFENDANTS' MISCONDUCT

### A. __The Scheme to Pump Up the Price of Galena's Stock.__

i.    **Galena retains Lidingo and DreamTeam to boost Galena's stock price**

67.    After a slight rise in price in the spring of 2013, Galena's stock price dropped below $2.00/share for much of July 2013.

68.    Around the same time (July 2013), Galena entered contracts with two stock promotion and investor relations firms that it had previously used to promote its stock, DreamTeam and Lidingo.

69.    Lidingo, which Galena previously had hired to tout its stock price in advance of public offerings, reached out to Galena in early July 2013.  On July 10, 2013, Lidingo's principal, Bjorlin, emailed Ahn to pitch stock promotion services, which Ahn forwarded to Bernarda.  Bjorlin wrote the Galena's stock "[d]oesn't look too great," offered Lidingo's help, and said that Lidingo's efforts had succeeded in boosting another client's stock.  (Ex. 170)[3].

70.    By the end of the month, Ahn signed a contract with Lidingo with an effective date of August 1, 2013.  (Ex. 37).  The Lidingo contract obliged Galena to pay Lidingo a cash fee of $20,000/month plus expenses.  (Ex. 37).  Ahn also awarded Lidingo 250,000 options to buy Galena common stock at an exercise price of the price the agreement closed, with 100,000

---

[3] References to "(Ex. __)" are to Exhibits to the Report to the Board of Directors of Galena Biopharma, Inc. Regarding the 2012-2014 Market Visibility Campaigns and the Sales by Insiders in the First Quarter of 2014. Although plaintiff's counsel has chosen to cite to these exhibits when possible, for the sake of clarity, plaintiff's counsel does not concede that these exhibits present a full and complete record of the fraud perpetuated by defendants; instead they are merely a strategic selection of documents culled and redacted by Galena's attorneys from 140,000 pages of documents that were purportedly reviewed.  Galena has removed these exhibits from its website.

options vesting immediately and the remaining shares vesting over eight months.  (Ex. 86).

Dunlap was copied on correspondence between Ahn and Lidingo regarding the email blasts that

Lidingo was working on in consideration for stock options.  (Ex. 85).  As a result of receiving

Galena stock options, the Lidingo Defendants had a motive to manipulate Galena's stock price

by, among other things, using social media and email blasts or exercising the options and making

trades that increased the volume of trades and overall demand for the stock.  Indeed, Lidingo

represented to Ahn that the equity stake in Galena was how Lidingo generates its income.  This

information was shared with Dunlap, which should have raised red flags about the nature of

Lidingo's promotional campaign.  As a result, Lidingo was highly motivated to increase

Galena's stock price and had an opportunity to do so by its work in email blasts and message

boards and by trading a large volume of Galena stock.

71.     At around the same time, in July 2013, Ahn asked Bernarda to interview three

investor relations firms that could potentially increase Galena's stock price.  Tiberend Strategic

Advisors ("Tiberend") and DreamTeam were two of the three firms.  (Ex. 72).

72.     Tiberend is a traditional full service investor relations firm specializing in

healthcare and life sciences industries.  Tiberend quoted Galena $3,500 per month for a three

month trial period.  (Ex. 72).

73.     DreamTeam emphasized that it could use a variety of brands to produce what

appeared to be a broad base of support for Galena.  For example, Mission IR stated that it would

use all of the DreamTeam "Family of Business Brands" (15 in all) and DreamTeam "Press

Distribution Partners" (82 in all).  (Ex. 11).  Among other things, DreamTeam stated that it

would distribute articles to Dream Team's blogs and message board platforms and leverage

Dream Team's extensive online social network to maximize exposure.

74.    Bernarda recommended that Galena not hire DreamTeam and claimed that Tiberend was better because it treated writers as journalists. Bernarda also stated that with regard to DreamTeam, "I don't think this is what we need, yet." Further, Bernarda noted the high cost of DreamTeam, at $15,000 per quarter, with $25,000 for "additional 'support' services" for a total of $40,000/quarter ($13,333/month). Bernarda stated that by hiring Tiberend and not Dream Team, Galena would avoid "run[ing] into the same issues…" by which she meant scrutiny from regulatory authorities.

75.    Contrary to Bernarda's advice, Ahn hired DreamTeam for a social media relations campaign for Galena. Despite her previous statement that Galena didn't need DreamTeam "yet," Bernarda expressed excitement about the DreamTeam contract in email and advised Ahn that Galena could look to add on to the initial contract if the "first [p]hase works out." (Ex. 72). On July 23, 2013, Ahn executed a "platinum" social media relations agreement with Dream Team[4] for a 90-day campaign for $25,000/quarter. (Ex. 11). Ahn later executed a 150-day DreamTeam contract for $25,000, on December 3, 2013. (Ex. 12). In total, Galena was engaging DreamTeam to promote Galena stock for approximately $8,333/month, which was almost three times the monthly contract price for a traditional investor relations firm like Tiberend. In other words, Galena paid DreamTeam well over the market value of a reputable investor relations firm.

76.    A principal goal of Galena's engagements of Lidingo and DreamTeam was to pump up Galena's stock value. After only a week of promotional efforts, Dream Team's McCarthy sent an email to Ahn tracking the increases in Galena's stock price for the week of

---

[4] As a technical matter, the DreamTeam affiliate Mission IR appears to be the relevant party to the social media relations contract with Galena, and payments were to be made to "Mission Investor Relations, LLC" and remitted to a bank in Atlanta, Georgia. However, DreamTeam principal McCarthy is listed as the contact, at email address Micahel@DTG.fm. Because it is difficult to discern where DreamTeam ends and Mission IR begins, references to Galena's contractual relationship with Mission IR will refer to DreamTeam as the contracting party.

July 25, 2013.  The stock began the week at $1.68/share and rose through the week to close at $1.95 on July 31, 2013.  McCarthy wrote "$2.00 here we come!" to which Ahn replied "Great start!"  Ahn and McCarthy thus both acknowledged that the true measure of Dream Team's success was the increase in Galena's stock price.

77.     In Lidingo's work for Galena, Galena explicitly acknowledged Lidingo's purpose of boosting Galena's stock price.  In January 2012, when Galena first hired Lidingo, Lidingo's Bjorlin wrote to Ahn to say that Galena had second best performing stock in first quarter due to a very "successful campaign."  (Ex. 58).  Later in that year, Bjorlin pitched additional email promotion services to Galena and cited previous promotions in October 2012 with an increase in stock price and volume.  (Ex. 62).  Bjorlin guaranteed an increase in stock price by offering a refund of Lidingo's fee if the stock price did not increase by at least 25% by year end.  (Ex. 62).  Under these terms, Ahn agreed to continue Lidingo's engagement for $20,000.  (Ex. 61).  Ahn and Bernarda were both well aware of the purpose of methods of Lidingo's promotion campaign.  (Exs. 62, 64, 66).  Ahn referred to discussing the Lidingo "situation" with "the team and Remy" after Bernarda starts "full time" in May 2013.  (Ex. 70).  In July 2013, Ahn responded to Bjorlin's email that Galena's stock doesn't look "too great" and Lidingo's representation that it had boosted another company's stock. (Ex. 170).

78.     Galena used DreamTeam and Lidingo to promote Galena stock using a variety of channels designed to create a clamor of voices on third-party websites, on social media platforms, on message boards, and in email campaigns to promote Galena stock and to dismiss Galena detractors.  A DreamTeam promotional brochure provided that "We reach a vast audience through our partners and media contracts, and for those who do their own research, it certainly helps to have positive information coming from multiple sources."  Lidingo, for its part,

noted that its strategy for Galena included publishing "original" articles on various websites, distributing the message to targeted audiences, and leveraging message board and forums to increase traffic.  Specifically, in a Lidingo campaign for Galena, it noted that "[m]essage boards have been monitored closely and will continue to be worked through out campaign to maintain a positive tone." (Ex. 56).  With its stock options, Lidingo also had the ability to manipulate Galena stock by trades.

ii. **Galena reviews and approves articles for publication on important investor websites that contain materially false statements and omissions**

79.    First, Galena used DreamTeam to produce bullish articles about Galena that were ultimately posted on third-party websites, including SeekingAlpha.com ("Seeking Alpha"), Forbes.com, Wall Street Cheat Sheet ("Cheat Sheet"), TheStreet.com ("The Street"), and MotleyFool.com ("Motley Fool").    These third-party websites have various disclosure requirements designed to comply with various disclosure requirements under Section 17(b) of the Securities Act of 1933 [15 U.S.C. § 77q(b)], which in relevant part prohibits publicizing information about a security without "fully disclosing" any consideration received or to be received, directly or indirectly, from the issuer.  Each third-party website's approach to disclosure requirements is described in more detail below.

a)    Seeking Alpha is a leading website used by stock analysts and professional and institutional investors to publish independent analysis and original investigative journalism related to investments.  Seeking Alpha publishes third-party reports, analysis, and commentary, and permits open discussion of articles in the comment sections.  To maintain its credibility and usefulness, Seeking Alpha requires that articles published on its site affirmatively state, just below the title, "I wrote this article myself, and it expresses my own opinions.  I am not receiving compensation for

it" (referred to as the "Seeking Alpha Disclosure.").  Although Seeking Alpha permits the use of pseudonyms, it strictly enforces an author code of conduct that, among other things, requires disclosure of an author's position in any company they write about, prohibits paid promotion, and prohibits the use of multiple aliases without disclosure. Anyone reading a published Seeking Alpha article would see this disclosure.

b)      Forbes.com is a website for the business magazine, Forbes.  Forbes.com features a contributor model that attracts a significant number of contributors, page views, and comments.  Forbes.com permits paid promotional articles, but in order to ensure that readers are not misled, Forbes.com requires that promoters disclose that articles are a paid promotion and disclose the identity of the person paying for the promotion.

c)      Cheat Sheet is an influential investor website that purports to receive 15,000,000 monthly unique visitors and 110,000,000 monthly page views.  It is recognized as a top financial news outlet by the Wall Street Journal.  Most of Cheat Sheet's articles are written by its professional staff, but in the fall of 2013, Cheat Sheet launched a contributor network, and provided clearance to 12 outside contributors, four of whom used aliases associated with Dream Team.  Cheat Sheet forbids undisclosed stock promotions, so contributors must disclose if they are receiving compensation for writing an article.

d)      The Street is a website that provides news and financial analysis for investors.  The Street has a formal conflicts and disclosure policy.  Under this policy outside columnists may write about companies in which they hold shares, but must disclose such ownership; outside columnists may not, however, be paid promoters.

e)    Motley Fool is a multimedia financial-services company offering investors free and fee-based products designed to help them take control over their financial lives. Motley Fool's website provides news, analysis, and commentary, including commentary on individual stocks. Motley Fool's website has millions of viewers. Motley Fool has a disclosure policy to increase transparency and accountability. That policy permits investors to publish articles, but must disclose the investor's position or beneficial interest in the stock. Nothing in the disclosure policy permits paid promotional articles that lack disclosure of the paid promotion.

80.    Galena recognizes the significance and influence of third-party websites like Seeking Alpha on the investment community; in a September 2013 lawsuit over comments made on a Seeking Alpha article, Galena stated that "Seeking Alpha is a leading website for financial news [that is] extremely influential [and] relied on by market analysts, and viewed by millions of investors worldwide." *Galena Biopharma, Inc. v. Ioannides*, 13-cv-1745-HA ¶ 7 (D. Or. 2013). Galena has acknowledged that Seeking Alpha is very influential for the bio-tech sector. Galena's recognition of the importance of Seeking Alpha is backed up by academic research finding a correlation between negative comments on Seeking Alpha articles are correlated to lower stock prices: using negativity on Seeking Alpha as an index outperformed broader market indices.

81.    Under the first prong of the stock promotion scheme, DreamTeam Defendants worked on bullish articles for publication on these third-party sites, primarily Seeking Alpha. These articles echoed positive news about key Galena catalysts coming from Galena press releases and securities statements. DreamTeam's agents used misleading and false aliases to post articles to the third-party sites after final review, edits, and approval from Galena.

DreamTeam recruited such agents to post articles on Galena to the third-party sites after final review, edits, and approval from Galena.  DreamTeam paid its agent "authors" for work on the articles for investor websites, even though the investor websites did not allow paid writers (or required disclosure).  Galena's officers, particularly Ahn and Bernarda, reviewed and approved these articles for publication, and ensured that DreamTeam was paid for the articles.  Galena required that the articles not state that they were paid promotional materials.  These articles were posted to the third-party sites using various aliases, many of whom falsely claimed to be established, credible investment professionals, and all of whom falsely stated that the articles were not paid promotional materials (or, alternatively omitted a statement that the articles were paid promotional materials).  Galena controlled and had the right to control DreamTeam and its agents with regard to the articles' content, including the ultimate decision of whether to publish it at all, and the particular decision of stating that the articles were not paid promotional materials.

83.    McCarthy, as principal for DreamTeam, had a detailed knowledge of and participated in the drafting, review, and publication of the articles.  (Exs. 76, 81, 83, 108, 110).  One of these emails is an August 7, 2013 email from McCarthy to Ahn and Bernarda that links to the *Seeking Alpha* article authored by "Wonderful Wizard" on August 6, 2013. This email contains the subject line "GALE [Galena's stock symbol] article published yesterday via our team." McCarthy further notes in the email that the article took "many hours to write" and stating that "we," apparently referring to DreamTeam, cannot make *Seeking Alpha* publish when they want. This shows detailed knowledge of the drafting and publication of the article.

83.    Second, after the articles were posted to third-party websites, Galena had DreamTeam and Lidingo promoting Galena on affiliate websites, social networks, blogs, and message platforms, and in email blasts.  DreamTeam and Lidingo attempted to create a

perception of legitimacy and objectivity by posting under different aliases on different webistes, social media, and message boards.  Thus, after DreamTeam published a bullish Galena article on a third-party website, DreamTeam would reference the article on its own website[5] and blog and then use various aliases in social media to tout the bullish articles on Galena.  For example, after DreamTeam published a pro-Galena article on August 6, 2013, users affiliated with DreamTeam logged on to a Yahoo! Finance page on Galena to post that the article was "definitely worth checking out" and an "encouraging article [] I'm buying more [Galena stock] tomorrow."  As another example, DreamTeam would use its blog to call attention to pro-Galena pieces, but present the articles as the work of an independent third party.  In addition, DreamTeam used numerous aliases on Facebook, Twitter, and other social media and networking sites to bring attention to the articles.  DreamTeam had the right to decide whether or not to make disclosures of the aliases or paid promotional campaign in the articles published on third party websites.

    84.    Lidingo promoted Galena with email blasts and posts to third-party message boards and on social media and networking sites, "working" them in order to reinforce a consistently positive opinion of Galena.  Lidingo failed to disclose that it was using using false aliases and that it was paid by Galena in Lidingo's promotional posts on various websites and social media.  Lidingo had control over whether or not to make the disclosures the securities laws required.

    85.    Lidingo Defendants also had an opportunity to manipulate Galena stock through volume trading of Galena stock acquired as part of the social media relations contract.  Lidingo Defendants had a motive to tout Galena stock in violation of securities laws because revenue

---

[5] Articles posted on DreamTeam and affiliate websites did not disclose that DreamTeam had been compensated by Galena, but a general disclaimer page on Dream Team's webpage provided a compensation disclosure listing Galena.

from the stock options purportedly was how Lidingo made a profit on its "investor relations" work for Galena.

86.     The various efforts of DreamTeam Defendants and Lidingo Defendants were material to the market for at least two reasons: (a) publishing under many different aliases and in many different mediums convinces investors that the positive analysis, echoed and regurgitated and repackaged by so many different people, must be accurate (and conversely, that any negative analysis of Galena was inaccurate), and (b) it convinces investors that there is heavy demand for Galena stock.

iii.    **Defendants make materially false statements and/or omissions in promotional articles, SEC filings, press releases, and public statements**

87.     On August 1, 2013, Bernarda emailed Ahn about a promotional Q&A opportunity provided by Tiberend.  The opportunity was an interview with Alan Saltzman of Regarded Solutions.  Bernarda took a "first stab" at preparing answers to Saltzman's interview questions and asked Ahn to send edits to "return to the author," stating that "we will be able to review it before it goes to print."  (Ex. 76).  This Q&A provided a substantive foundation for many of the misleading statements to come about Galena catalysts, as it suggested that the Phase 3 for NeuVax™ was "progressing nicely" and that Galena "expect enrollment completion at the end of this year…" (*Id.* at 3).  Galena executives, namely Ahn and Schwartz would reiterate misleading statements about the progress of the NeuVax™ Phase 3 in the coming months.

88.     On August 6, 2013, after trading hours, a DreamTeam agent used an alias named "Wonderful Wizard" to publish a bullish article about Galena titled "Galena Biopharma Presents an Attractive Investment Opportunity" on Seeking Alpha.  (Ex. 5).  The article contained the Seeking Alpha Disclosure falsely stating that it was not a paid promotion, that author held the views expressed, and that author did not do business with Galena.  This was false because the

article was a paid promotion.  The article contained additional false statements about the

financial potential of Galena.  For example, the article falsely stated that NeuVax™ had the

potential to generate revenue of approximately $14 billion.  Galena through its officer Schwarz

later admitted, in a corporate update September 25, 2014, that the market potential was around

one billion dollars.  Galena officers, namely Ahn and Bernarda, reviewed and approved the

article before publication, and ultimately controlled whether and when it was published.

89.      After retaining DreamTeam and Lidingo, Galena initiated a secondary offering[6]

by filing an amended registration statement on Form S-3/A on August 9, 2013, signed by Ahn

and Dunlap, and by Ahn on behalf of the Galena Directors.  The amended registration statement

commented on the possible fluctuations in stock price, and cited numerous factors, but omitted to

disclose that the most likely cause of fluctuations was its own campaign to pay Lidingo and

DreamTeam to pump its stock.

90.      On August 22, 2013, after trading hours, a DreamTeam agent used an alias named

"Stock Whisper" to publish a bullish article about Galena titled "Galena: 2 Goldmine Drugs for

Cancer" on Seeking Alpha.  The article contained the Seeking Alpha Disclosure falsely stating

that it was not a paid promotion, that author held the views expressed, and that author did not do

business with Galena.  Galena officers, namely Ahn and Bernarda, reviewed and approved the

article before publication, and ultimately controlled whether and when it was published.  Seeking

Alpha removed the article due to a violation of the site's terms of use, and Galena's Special

Committee did not make records of it available.

91.      On August 26, 2013, Jamie Spangler of DreamTeam wrote to Ahn and Bernarda

"It was great to see GALE trade at $2.50 again" to which Ahn responded to Spangler and

---

[6] This secondary offering is a public offering made after the initial public offering, as distinguished from an offering
of previously-issued securities by current shareholders.

Bernarda "So far so good.  We need to **keep control** of the boards."  (Ex. 76 p. 9) (emphasis added).

92.     On September 13, 2013, Galena entered into underwriting agreement to sell stock in a public offering (the "Underwriting Agreement") which Galena filed that day with the SEC as an exhibit to an 8-K filing.  The Underwriting Agreement contains Representations and Warranties of Galena that include a statement that it has not taken, nor will it take, directly or indirectly, any action designed to or which might reasonably be expected to cause or result in, or which has constituted or which might reasonably be expected to constitute, the stabilization or manipulation of the price of the Common Stock or any security of the Company to facilitate the sale or resale of any of its Securities.

93.     That same day, September 13, 2013, Galena published a Prospectus in which it commented on the possible fluctuations in stock price, and cited numerous factors, but omitted to disclose that the most likely cause of fluctuations was its own campaign to pay Lidingo and DreamTeam to pump its stock.  The risks disclosed in the Prospectus included risks that could both increase Galena's stock price (such as clinical trial reports, quarterly operating results, announcements of business or strategic transactions, announcements of regulatory developments, and developments in patent or technology rights), and risks that could decrease Galena's stock price (such as public concern regarding the safety of Galena's products, funds not being available for financing, and the decline in stock prices for other large companies within Galena's industry).  Nothing in the nature of the risks disclosed limits the potential risks to risks that would move Galena's stock price only in one direction, or necessarily in both directions.

94.     On September 18, 2013, Galena sold 17,500,000 units, each consisting of one share of common stock and a warrant to purchase 0.35 of a share of common stock at an exercise

price of $2.50 per share, for net proceeds of $32.6 million to Galena.  Galena raised additional

proceeds of $5.2 million through the underwriters' exercise of over-allotment options.

95.     On September 26, 2013, before trading hours, a DreamTeam agent used an alias

named "Stock Whisper" to publish a bullish article about Galena titled "Galena: Acquisition

Prospects and Exciting Catalysts" on Seeking Alpha.  The article contained the Seeking Alpha

Disclosure falsely stating that it was not a paid promotion, that author held the views expressed,

and that author did not do business with Galena.  Galena officers, namely Ahn and Bernarda,

reviewed and approved the article before publication, and ultimately controlled whether and

when it was published.  Seeking Alpha removed the article due to a violation of the site's terms

of use, and Galena's Special Committee did not make records of it available.  That same day,

Galena's stock price rose from $1.94 to $2.08, or over 7.2%.  There was no other Galena-specific

news that day.

96.     On September 30, 2013, before trading hours, a DreamTeam agent used the alias

named "Stock Whisper" to publish a bullish article about Galena titled "Buy Galena on Abstral

Launch" on Seeking Alpha.  The article contained the Seeking Alpha Disclosure falsely stating

that it was not a paid promotion, that author held the views expressed, and that author did not do

business with Galena.  Galena officers, namely Ahn and Bernarda, reviewed and approved the

article before publication, and ultimately controlled whether and when it was published.  This

article was removed from Seeking Alpha due to a violation of the site's terms of use, and

Galena's Special Committee did not make records of it available.  There was no other Galena-

specific news that day, and Galena's stock price rose from $2.08 to $2.28, or over 9.6%.

97.     On October 9, 2013, Schwartz presented at the 12th Annual BIO Investor Forum,

at the Palace Hotel in San Francisco, California.  Schwartz explained that with the close of

Galena's public offering, Galena had money to proceed with key catalysts. He emphasized that Abstral® sales were about to launch. He also stated that the NeuVax™ Phase 3 was to complete enrollment at the end of 2013, with an interim analysis occurring in mid-2014, which was false, as the Phase 3 was not at all on pace to reach these enrollment milestones.

98.    On November 7, 2013, Galena filed its Form 10-Q/A (amended quarterly report) for the quarter ending September 30, 2013, which was signed by Ahn and Dunlap. The original report was filed on November 6, 2013. The 10-Q/A filing contains a material omission regarding Galena's engagement of DreamTeam and Lidingo to pump Galena's stock price. The filing also contains a material omission regarding Galena officers' review, editing, and approval of DreamTeam articles prior to publication, and Galena officers' control over whether and when such articles were published.

99.    The 10-Q/A filing for the third quarter of 2013 also contains false statements regarding the status of enrollment for the NeuVax™ Phase 3 PRESENT trial. Galena stated that it would "build value for patients and shareholders" by its "lead product candidate, NeuVax TM (nelipepimut-S) **currently in the Phase 3 randomized, multicenter present** (Prevention of Recurrence in Early-Stage, Node-Positive Breast Cancer with Low to Intermediate HER2 Expression with NeuVax Treatment) **study in 700 patients** under the FDSA-approved Special Protocol Assessment (SPA)" (emphasis added). Right after the statement about the NeuVax™ Phase 3, Galena said that it is "**enrolling 300 patients**" in a Phase 2b study for NeuVax™ and Herceptin®. (emphasis added) This contrast between the descriptions of the Phase 3 and SPA enrollments illustrates Galena's statement about the current status of the Phase 3 enrollment is false and misleading. Galena was not **currently** conducting the study in 700 patients as of November 2013, and was not close to completing enrollment of 700 patients in the Phase 3. In

fact, Galena did not announce complete enrollment of 700 patients until sixteen months later, in February 2015.

100.    On November 12, 2013, before trading hours, a DreamTeam agent used the alias "James Ratz" to publish a bullish article about Galena titled "Will Galena Biopharma Triple Soon?" on the Cheat Sheet.  (Ex. 6). "James Ratz" falsely claimed to be a portfolio manager with Zebra Capital Management (an actual hedge fund).  (Ex. 6).  The article failed to disclose it was a paid promotion, which was a material omission because it was a paid promotion.  Because the Cheat Sheet forbids paid promotions, the market assumed that the article expressed the author's opinion.  The article contained the false and misleading statement that "investors can soon expect an enrollment completion announcement [for the Phase 3 PRESENT trial] and then interim results on 70 events."  The article also contained the false and misleading statement that the potential annual revenue for NeuVax™ is $8.4 billion dollars.  Galena officers, namely Ahn and Bernarda, reviewed and approved the article before publication, and controlled whether and when it was published.  There was no other Galena-specific news that day, and Galena's stock price rose from $2.49 to $2.68, or almost 9.4%.

101.    On November 13, 2013, during trading hours, a DreamTeam agent used the alias "Stock Whisper" to publish a bullish article on Galena titled "Galena is Rallying On More Good News for Investors" on Seeking Alpha.  The article contained the Seeking Alpha Disclosure falsely stating that it was not a paid promotion, that author held the views expressed, and that author did not do business with Galena.  The article contained the false statement that "investors can soon expect an enrollment completion announcement [for the Phase 3 PRESENT trial] and then interim results on 70 events. These announcements should awaken investors and begin the rally in Galena shares."  The article also contained the false and misleading statement that the

potential annual revenue for NeuVax™ is $8.4 billion dollars.  Galena officers, namely Ahn and Bernarda, reviewed and approved the article before publication, and controlled whether and when it was published.  There was no other Galena-specific news that day, and Galena's stock price rose from $2.75 to $3.00, or almost 12%.

102.    On November 22, 2013, during trading hours, a DreamTeam agent used the alias "Kingmaker" to publish a bullish article on Galena titled "Galena Biopharma Continues to Develop a Deep Pipeline of Products" on Seeking Alpha.  (Ex. 88).  "Kingmaker" falsely claimed to "run a volatility trading group that focuses on exploiting differences in IV vs. HV in biotech names with upcoming catalysts."  The article contained the Seeking Alpha Disclosure falsely stating that it was not a paid promotion, that author held the views expressed, and that author did not do business with Galena.  The article falsely stated that Galena expects to complete the NeuVax™ Phase 3 enrollment early in 2014 and to announce an interim analysis based upon 70 events by summer of 2014 at the latest.  In fact, Galena was not close to completing Phase 3 enrollment and was not on track to have an interim analysis by the summer of 2014.  Galena officers, namely Ahn and Bernarda, reviewed and approved the article before publication, and controlled whether and when it was published.  There was no other Galena-specific news that day, and Galena's stock price rose from $3.50 to $4.00, or almost 15%.

103.    On December 3, 2013, Ahn presented on a corporate update on Galena at the Piper Jaffray Healthcare conference.  Ahn stated, among other things, that the NeuVax™ Phase 3 enrollment would be completed soon, which was consistent with previous company statements, but false and misleading because the Phase 3 was not close to completing enrollment.

104.    On December 4, 2013, a DreamTeam agent published a bullish article about Galena using Meyer's real name, titled "4 Reasons Why Galena Biopharma is Headed Higher."

(Ex. 7).  The article was published on the Cheat Sheet and recommended investing in Galena stock.  The article misleadingly omitted disclosure that it was a paid promotion, and the market assumed it expressed the author's opinion and that it was not paid for, because the Cheat Sheet prohibits paid promotions.  The article also falsely stated that "the commercial potential for NeuVax may reach $5 billion worldwide at its peak."  Galena officers, namely Ahn and Bernarda, reviewed and approved the article before publication, and controlled whether and when it was published.  Ahn reviewed and approved it on December 3, after Bernarda reviewed and edited it.  (Exs. 94, 95).  This article likely was drafted and published to counter a Seeking Alpha post questioning the reasons behind Galena's "bull run."  (Ex. 92).

105.    On December 10, 2013, a DreamTeam agent used the alias "Ted Mayer" to publish a bullish article on Galena titled "Galena Investment Funds Are Taking a Big Stake in Galena Biopharma" on Motley Fool.  The article recommended investing in Galena stock.  The article misleadingly omitted disclosure that it was a paid promotion.  The market assumed that the article expressed the author's opinion and was not a paid promotion, because Motley Fool requires disclosure of paid promotions.  Galena officers, namely Ahn and Bernarda, reviewed and approved the article before publication, and controlled whether and when it was published.  Motley Fool removed the article from its site, and Galena's Special Committee did not make records of it available.

106.    On December 12, 2013, Tiberend raises concerns of paid promotions efforts to Bernarda, saying that the practice of the IR firm obtaining fees for publishing favorable coverage and "hid[ing] this connection" between the paid promotion and the coverage borders "on fraud" which will eventually get noticed by regulators and "trouble could ensue." (Ex. 99).

107.    On December 16, 2013, a DreamTeam agent published another bullish article on Galena using Meyer's real name, titled "Hope for Breast Cancer Patients Is Around the Corner," on Forbes. The article recommended investing in Galena stock. The article misleadingly omitted to disclose it was a paid promotion. The market assumed that the article expressed the author's opinion and that is was not paid for, because Forbes requires disclosure of paid promotions. Galena officers, namely Ahn and Bernarda, reviewed and approved the article before publication, and controlled whether and when it was published.

108.    On December 24, 2013, Galena received a letter dated December 23, 2013 denying Breakthrough Therapy designation for NeuVax. (Ex. 39).

109.    On January 9, 2014, Mad Money, the CNBC television show hosted by Jim Cramer on investments featured a caller asking Cramer about Galena during the "lightning round." Cramer essentially said that he did not know much about Galena but acknowledged that Galena stock had been rising and gave it his blessing. Cramer implied that he would look into Galena.

110.    On January 15, 2014, a DreamTeam agent published a bullish article on Galena using the alias "Christine Andrews" titled "The Momentum Continues for Galena Biopharma." (Ex. 9). The article falsely stated that "Christine Andrews" is a fund manager with almost 20 years of investment experience. (Ex. 9). DreamTeam posted the article on the Cheat Sheet. The article misleadingly omitted disclosure that it was a paid promotion. The market assumed the article expressed the author's opinion, because Cheat Sheet prohibits paid promotions. The article also contained the misleading statement that Abstral sales may "be sufficient to fund the entire company's research and development program," when in fact the Galena's financial health was deteriorating; the company had approximately $55 million in cash, but had not made much

progress in the very expensive process of enrolling patients in the Phase 3 PRESENT study. Galena officers, namely Ahn and Bernarda, reviewed and approved the article before publication, and controlled whether and when it was published.

111.    On January 16, 2014, at 9:00 a.m. PST, Galena held a board meeting to discuss several matters.  (Ex. 28). The board meeting included presentations on, discussions of, or decisions on, among other things, the following issues:

a)    Galena's preliminary 2013 earnings, including revenue for Abstral® of approximately $3.1 million, none of which had been publicly disclosed;

b)    Galena's investor relations and public relations activities (led by Bernarda) as well as 2013 and 2014 marketing campaigns;

c)    Galena's contract with Lidingo and grant of stock options, which the board ratified;

d)    NeuVax™ Phase 3 trial enrollment figures, including enrollment projections versus "actuals" and actual enrollment as of 12/31/13; and

e)    The FDA's denial of "Breakthrough Designation" status for NeuVax™ and other regulatory announcements.

112.    After attending the board meeting, at 3:00 p.m. PST on January 16, 2014, Ahn appeared on the Executive Decision segment of CNBC's Mad Money with Jim Cramer.  During the interview, Ahn made several false and misleading statements, including the following:

a)    Ahn states that Galena's Phase 3 for NeuVax™ "is **already in 15 countries and 700 patients** to show that we can bring [NeuVax's] benefits in a commercial area and address a **multibillion dollar opportunity**." (emphasis added).

Page 39 – COMPLAINT

b)      When asked by Cramer about whether Galena's Phase 3 was suffering

setbacks, Ahn said "No."  At the time, Ahn knew that the Phase 3 had suffered delays and

that the FDA had denied the Breakthrough Therapy designation.  Later in the interview,

Ahn emphasized Galena's work to get a Special Protocol Assessment from the FDA, but

omitted mention of the regulatory setbacks to the Phase 3, including the FDA's denial of

the Breakthrough Therapy designation.

c)      In response to criticism that the Phase 3 PRESENT trial for NeuVax™ is

going slower than expected, Ahn emphasized that Galena's Phase 3 already was in "in

130 hospitals in 15 countries" and that the Phase 3 had a "pace and progression" such that

there would be full enrollment[7] by "mid-year" of 2014 and have an interim analysis in

one year's time.  Ahn stated that Galena had "now over 500 patients that [sic] have seen

NeuVax™," again suggesting the Phase 3 study was further along than it actually was.[8]

d)      Before the interview ended, Ahn again trumpeted a multi-billion dollar

potential for NeuVax™: "We think we are addressing a **multibillion dollar**

**opportunity**."

e)      Ahn did not make any forward looking statement disclaimers during the

interview.

113.    On January 20, 2014, Ahn presented on Galena at the Noble Financial

Conference.  Ahn again made a false and misleading statement that Galena would complete

enrollment for the NeuVax™ Phase 3 soon.[9]

---

[7] This is not inconsistent with Ahn's previous statement that there was 700 patients enrolled, because drug sponsors often "over-enroll" patients for clinical trials.  In a later SEC filing announcing third quarter earnings for 2014, Galena explained that it intended to over enroll the trial.
[8] Having 500 patients that have "seen" NeuVax is not inconsistent with Ahn's earlier statement about the study having 700 patients enrolled, because under the trial's protocol after the patient is enrolled, the patient has up to two months to actually receive the NeuVax™ vaccine.
[9] Again, this statement is not inconsistent with having 700 patients enrolled, because as noted in Galena SEC filings,

114.    On February 4, 2014, Ahn made statements for an interview conducted by the alias "Regarded Solutions" for publication on Seeking Alpha.  Ahn and other Galena officers reviewed and approved of the publication.  The publication states that Ahn's responses are "direct and fact based."  Ahn states that one of Galena's priorities in "[a]dvancing our lead product candidate, NeuVax$^{TM}$ (nelipepimut-S) **currently in its Phase 3 randomized, multicenter PRESENT** (Prevention of Recurrence in Early-Stage, Node-Positive Breast Cancer with Low to Intermediate HER2 Expression with NeuVax Treatment) **study in 700 patients** under the FDA-approved Special Protocol Assessment; (3) Continuing enrollment in our ongoing Phase 2b randomized, multicenter clinical trial **expected to enroll 300 patients to study NeuVax in combination with Herceptin®** (trastuzumab; Genentech/Roche). . . ."  In comparing the description of the status of enrollment in the combination study with Herceptin® ("expected to enroll 300 patients") versus the language about the Phase 3 ("currently in its Phase 3 . . . study in 700 patients…"), Ahn again made false and misleading statements about the status of the Phase 3 enrollment.  Galena was not currently conducting the Phase 3 study in 700 patients as of February 2014, and was not close to completing enrollment in the Phase 3.  In fact, Galena did not announce complete enrollment of 700 patients until sixteen months later, in February 2015.  Ahn had the actual enrollment information from the January 16, 2014, board meeting, and continued to mislead investors that the Phase 3 PRESENT trial was already being conducted in 700 patients.

115.    On February 5, 2014, before trading hours, a DreamTeam agent used an alias "John Mylant" to publish an article titled "Galena Biopharma Has a Promising Pipeline for Revenue Growth" on Seeking Alpha.  (Ex. 8).  The article recommended investing in Galena

---

Galena announced it would over-enroll patients for the Phase 3.

stock.  The article contained the Seeking Alpha Disclosure falsely stating that it was not a paid promotion, that author held the views expressed, and that author did not do business with Galena. Galena officers, namely Ahn and Bernarda, reviewed and approved the article before publication, and controlled whether and when it was published.

116.     On February 12, 2014, Ahn provided a corporate update on Galena at the Leerink Global Healthcare conference.  Ahn stated that Galena had $55 million in the bank and was near complete enrollment for the Phase 3 trial.  Ahn analogized Galena's progress to that of a rocket and said that Galena had enough fuel to get to the end of the trial.  In response to a moderator's question about criticism of Galena from Adam Feuerstein in a Seeking Alpha article that day, Ahn said that Feurstein was a blogger who had been writing negative things about Galena for three years and that the article had no merit.

117.     On March 17, 2014, Galena filed its annual report for 2013 on Form 10-K, signed by Ahn, Dunlap, and the Galena Directors.  The filing discusses the significance of the FDA's conferral of an accelerated approval, such as designation of a "fast track" product.  Despite mentioning this point, Galena omitted mention that the FDA denied accelerated approval of NeuVax™ as a Breakthrough Therapy in a December 23, 2013 letter.  Galena's 10-K also omitted mention of a relationship with Lidingo or DreamTeam and its effect on the stock value. Finally, Galena modified the description of the enrollment status for the NeuVax™ Phase 3: Galena said its strategy is to build value for patients and shareholders by "[c]ompleting the pivotal Phase 3 randomized, multicenter PRESENT (Prevention of Recurrence in Early-Stage, Node-Positive Breast Cancer with Low-to-Intermediate HER2 Expression with NeuVax Treatment) study of our lead product candidate, NeuVax™ (nelipepimut-S) in 700 patients under a U.S. Food and Drug Administration (FDA)-approved Special Protocol Assessment (SPA)."

The addition of "completing" implied that Galena had not yet completed enrollment of 700 patients, in stark contrast to Galena's November 2013 SEC filing and previous statements of Galena and Ahn that expressly or impliedly stated that Galena had enrolled 700 patients.

### B.  The Scheme to Dump Galena's Inflated Stock.

#### i.  Galena board awards an unprecedented and lavish amount of stock options to insiders

118.    Galena held a meeting of its Compensation Committee on November 22, 2013.

119.    Kriegsman, Chin, and Nisi served on Galena's Compensation Committee for the period during which the violations of securities laws alleged in this Complaint occurred.

120.    The primary purposes of the Compensation Committee is to carry out the responsibilities set forth in Galena's charter relating to the compensation of Galena's executive officers and non-employee directors and to review and approve compensation discussions, analysis, and reports regarding executive compensation.  The Compensation Committee is asked to balance Galena's interest in conserving cash and preventing stockholder dilution and Galena's interest in using compensation to attract, retain and motivate management, but in reconciling these competing concerns, the Compensation Committee is required to act in the long-term best interests of Galena and its stockholders.

121.    The responsibilities and authority of the Compensation Committee include reviewing and making recommendations to the Board for adoption, amendment or termination of incentive compensation plans and equity-based plans, administering Galena's existing compensation plans, granting stock options, shares of restricted stock and other equity-based awards under Galena's incentive compensation plans and other equity-based plans, including awards to Galena executive officers, and determining the terms of such equity-based awards.

122.    The Compensation Committee has responsibility and authority to advise the board on the award and exercise of stock options.  The Compensation Committee could have stopped the pump and dump scheme (a) before the Galena Board of Directors awarded lavish stock options on certain Galena officers and Galena Director Defendants (including the members of the Compensation Committee), or (b) after the award of stock options, but before the exercise of stock options in early 2014, but it failed to do so.

123.    At the board meeting of November 22, 2013, the board granted unprecedented amounts of stock options to certain Galena officers, including Ahn, Dunlap, and Schwartz, and the Galena Director Defendants, with each director receiving 200,000 options with a strike price of $3.88.

124.    As documented in the 2014 Form DEF 14A Proxy statement ("2014 Proxy Statement"), the board approved the following compensation and stock options:

| Name | Position/Title | Number of Options | Total 2013 compensation |
|------|---------------|-------------------|-------------------------|
| Mark Ahn | President, CEO & a Director | 600,000 | $3,099,363 |
| Brian Hamilton | EVP & CMO | 300,000 | $930,339 |
| Mark Schwartz | COO | 300,000 | $1,583,640 |
| Ryan Dunlap | Chief Accounting Officer (at the time) | 150,000 | $684,410 |
| Rudolph Nisi | Director | 200,000 | $633,470 |
| Stephen Kriegsman | Director | 200,000 | $628,220 |
| Sanford Hillsberg | Director | 200,000 | $671,220 |
| Stephen Galliker | Director | 200,000 | $749,720 |
| Richard Chin | Director | 200,000 | $610,970 |
| William Ashton | Director (appointed April 2013) | 200,000 | $706,670 |

125.    The timing of the stock option grants was unprecedented and unusual.  As Galena's 2014 Proxy Statement states, Galena typically awards options at the end of each fiscal year or in January of the immediately following fiscal year.

126.    The fair market value of the stock option grants to each director was $516,000, with each director receiving a total compensation between $610,970 and $749,720.

> ii.    **Galena insiders sell off more than $16 million in Galena shares in January 2014, with six out of seven insiders selling at least 87% of their shares**

127.    Galena's original insider trading policy forbade employees and directors from transacting in Galena's stock without the affirmative preapproval of Ahn (the "Old Policy"). (Ex. 18).

128.    In the summer of 2013, Dunlap drafted an amended insider trading policy (the "New Policy"). Dunlap's version, dated August 15, 2013, defined "insider" to include directors, and provided that:

> a)    Insiders could not sell Galena stock while in the possession of material nonpublic insider information, except in circumstances not relevant here; and

> b)    All trades were restricted to pre-announced "trading windows."  (Ex. 19).

129.    Thus, according to Dunlap, the New Policy was "a little less restrictive" than the Old Policy. (Ex. 74).

130.    Dunlap submitted his draft to Galena's Nominating and Governance Committee (the "Governance Committee") for its consideration at its October 7, 2013 meeting.  The Governance Committee resolved that it would recommend that the Board adopt the draft policy at its January 16, 2014 meeting.

131.    On December 19, 2013, Galena's outside counsel Dale Short of TroyGould told Defendant Dunlap that Defendant Kriegsman sought to use options to buy 200,000 shares,

immediately selling them for a profit. Kriegsman's sales were forbidden under both the Old

Policy (because the sale was not approved by Ahn) and the New Policy (because the sale fell

within a trading blackout).  Further, Galena was at the time contemplating the acquisition of

Mills Pharmaceuticals, LLC. Thus, in addition, Kriegsman had material non-public information

about Galena's proposed acquisitions.  Dunlap advised Short that Kriegsman should not be

selling shares. (Ex. 100).

      132.    Short quickly responded by asking Galena to violate its insider trading policy:

> "Yes, it's an issue, but he seems insistent, if you know what I mean. If the sale is
> approved, we could caution him in writing of the risk associated with the sale.
> Let me know if I can give Steve the go-ahead and I will provide the cautionary
> advice." (Ex. 100).

      133.    Short also sent Dunlap two more emails asking him to break company policy for

Kriegsman's and other directors' benefits. Short added that the sale should be authorized because

"[i]t seems to me that you can expect other directors to want to sell shares to realize on their

stock options." (Ex. 100).

      134.    On December 20, 2013, Kriegsman personally emailed Mr. Dunlap, copying Ahn,

declaring that he would sell 200,000 shares of Galena stock, effective immediately.  In response,

Ahn reiterated that Kriegsman could not sell Galena stock at the time, but said he would be

"delighted" to allow Kriegsman's sale in mid-January 2014, in violation of  (a) Galena's

previous announcement that trading would not be permitted until March 13, 2014, and (b)

Galena's previous determination that earnings are material non-public information. (Ex. 101).

      135.    On January 16, 2014 the Board held a meeting, in which the Board was provided

with Galena's preliminary 2013 earnings. The preliminary earnings information, which

principally derived from Abstral® sales from the fourth quarter of 2013, was not publicly

disclosed. (Ex. 23).

136.    The January 16, 2014, minutes state that Ahn told the directors that insiders could trade in the Company's stock immediately. The Board minutes reflect that there was a subsequent discussion among the Board and that the Board lifted the blackout on trading. None of the Board members, however, actually remembered discussing or voting on the matter. Moreover, in interviews with the Special Committee, Galena Director Defendants took varying positions on whether there was a blackout at all (in which approval to sell would be unnecessary), a permanent blackout subject to Ahn's preapproval (which would require the directors to obtain Ahn's preapproval), or a blackout subject to open windows.  Had the Galena Director Defendants debated and voted on a resolution permitting trading, and then sold their shares in reliance on the resolution, it is unlikely they would have such incongruent memories. And as the Special Committee concluded, the directors' varying memories are "inconsistent" with the Board minutes, suggesting the minutes were doctored. (Special Committee Report, at page 32).  Whether or not there was an authorization, Galena's Special Committee concluded that "the Company opened a trading window seemingly for the sole purpose of allowing insiders to sell substantial shares of their Company stock." (*Id.*)

137.    Galena insiders then sold over $16 million of their stock:

| Name | Date | Shares | Price | Proceeds ($) | Percentage of total holdings sold |
|---|---|---|---|---|---|
| Kriegsman | 1/23/2014 | 150,000 | Sale at $5.92 per share | 888,540 | |
| | 1/22/2014 | 250,000 | Sale at $6.13 per share | 1,532,500 | |
| | 1/17/2014 | 200,000 | Sale at $7 per share | 1,400,000 | |
| Total - Kriegsman | | 600,000 | | 3,821,040 | 96.8% |
| Hillsberg | 1/30/2014 | 250,000 | Sale at $5.41 per share | 1,352,500 | |
| | 1/17/2014 | 200,000 | Sale at $6.93 per share | 1,385,000 | |

| Name | Date | Shares | Price | Proceeds ($) | Percentage of total holdings sold |
|------|------|--------|-------|--------------|-----------------------------------|
| Total - Hillsberg | | 450,000 | | 2,737,500 | 93.3% |
| Nisi | 1/29/2014 | 250,000 | Sale at $5.41 per share | 1,320,000 | |
| | 1/17/2014 | 200,000 | Sale at $6.93 per share | 1,380,000 | |
| Total - Nisi | | 450,000 | | 2,700,000 | 98.6% |
| Chin | 2/12/2014 | 187,500 | Sale at $4.33 per share | 812,438 | |
| | 1/30/2014 | 75,000 | Sale at $5.57 - $5.61 per share | 418,755 | |
| Total - Chin | | 262,500 | | 1,231,193 | 100% |
| Galliker | 2/3/2014 | 300,000 | Sale at $4.18 per share | 1,253,040 | |
| Total - Galliker | | 300,000 | | 1,253,040 | 96.8% |
| Schwartz | 1/30/2014 | 100,000 | Sale at $5.57 per share | 556,500 | |
| Total - Schwartz | | 100,000 | | 556,500 | 19.6% |
| Ahn | 1/27/2014 | 796,765 | Sale at $4.83 per share | 3,848,374 | |
| Total - Ahn | | 796,765 | | 3,848,374 | 87% |
| **Total - All** | | **2,959,265** | | **16,147,647** | |

Source: 2014 Form DEF 14A (the "2014 Proxy Statement")

138.    The insider defendants' stock sales were not made pursuant to pre-arranged Rule 10b5-1 trading plans, and none of the selling defendants had sold stock on the open market in the previous four years.

139.    Dunlap knew of the material information (in addition to the 2013 earnings) that the insiders were privy to from the January 16, 2014, board meeting, including the real enrollment figures for the NeuVax™ Phase 3, the FDA's denial of Breakthrough status, and the unlawful stock touting campaign of Lidingo, but he did not stop the insider trading or report it, in contradiction of the Galena's policies as well as Galena's Code of Ethics, adopted January 2012.

140.    Galena insiders were well aware that their stock sales were inappropriate and that the "dump" of stock would alert Galena investors to the scheme.  For example, forced to disclose insiders' stock sales on SEC Forms 4, a Galena manager sought "cool ideas/tricks" to file the required SEC forms without alerting investors.  Dunlap suggested Galena voluntary file numerous insider small "buys" of the officers (Schwartz, Ahn, and Dunlap) to confuse markets regarding the Galena Director Defendants' sales.  In response, Ahn added: "Got it . . . just spoke to John [Burns, a senior Galena manager].  Let's keep these issues to the 3 of us." (Exs. 107, 109).  Dunlap sought Schwartz's approval and signature for the attempt to cover-up the insider sales with small buys.  (Ex. 107).  Ahn implored Dunlap and Bernarda to keep the team of insiders "focused" so that they could avoid the insider trading problem from getting worse.  (Ex. 107).

141.    The Insider Trading Defendants' sales of Galena stock began on January 17, 2014, nearly two months prior to the previously discussed trading window that was to occur following the public release of Galena's 2013 earnings.  The Insider Trading Defendants timed their sales for a number of reasons.  First, thanks to the illicit stock pumping campaign by Galena and its agents, DreamTeam Defendants and Lidingo Defendants, Galena's stock hit its highest point since February 2010 on January 16, 2014.  There was no guarantee that the stock would remain at historically high levels for two more months.  Second, events like Ahn's Mad Money interview with Jim Cramer—which occurred hours after the January 16, 2014 board meeting— suggested that the scheme would unravel soon.   In the Mad Money interview on January 16, 2014, Ahn appeared confused at times, and made false and misleading statements about the Phase 3's enrollment numbers, progress, and lack of setbacks.  Jim Cramer mentioned the critical analysis of Galena by Adam Feuerstein and the University of Pennsylvania study concluding that

cancer vaccines which target a specific antigen (such as NeuVax™) are ineffective.  Ahn's

response did not inspire an endorsement from Cramer.  At this point, the Insider Trading

Defendants had to realize that Galena stock would not continue the bull run up to the trading

window in March 2014.  Instead, the Insider Trading Defendants realized that as the negative

news reached the marketplace, including revelations of Galena's true Phase 3 enrollment

numbers and setbacks (including the FDA denial of Breakthrough Therapy designation) and

Galena's deteriorating financial health, the Galena stock would tank.  Third, Insider Trading

Defendants, particularly Ahn, had to be concerned that relevations of Galena's use of

DreamTeam and Lidingo to manipulate Galena stock without required disclosures would reach

the marketplace, resulting in the decline of Galena's stock price.  Ahn and Bernarda were aware

(from communications with Tiberend) that the stock promotion campaign of DreamTeam and

Lidingo "border[ed] on fraud" and would invite suspicion and action from regulators and knew it

was only a matter of time before these illegal campaigns leaked to the marketplace.

> iii.    **Defendants' market manipulation scheme to pump up the price of Galena's stock is uncovered**

142.    Ahn and Dunlap were correct that the Insider Trading Defendants' dump of

Galena stock would alert Galena investors and drive down its stock price.

143.    Galena's stock price peaked on January 16, 2014, at $7.48 – the highest it had

been since March 2010. The very next day, Galena insiders began selling shares.

144.    Despite Galena officers' efforts to mix in small buys, the market noticed the

Forms 4 announcing the Insider Trading Defendants' stock sale.

145.    On January 23, the U.S. Federal News Service called attention to Hillsberg sale of

200,000 shares. On January 24, 2014, Markus Aarnio posted an article on Seeking Alpha titled

"Galena Biopharma:  3 Different Insiders Have Sold Shares This Year."  On January 27, Galena

appeared on a list of the top 30 public companies – ranked by the dollar value of insiders' stock sales in the previous week.

146.    Galena's stock price did not rise above its January 16, 2014, level. By January 31, 2014, driven by news reports of and concerns about insiders' sales, the price had fallen by $2.21, from $7.48 to $5.27, or about 29.5%.

147.    Matt Gravitt first discovered the illicit stock promotion. Mr. Gravitt published an article on Seeking Alpha titled titled "Galena Biopharma: Numerous Red Flags Suggest A Significant Overvaluation," which was first openly released to the public on February 1, 2014. Mr. Gravitt visited the website www.stockpromoter.com, a website that collects information concerning paid promotions based on disclaimers, and permits investors to type in a company symbol to see whether they are involved in any current promotion.  A search there revealed that tips.us (a website run by DreamTeam) had been promoting Galena, and though stockpromoters.com listed no compensation, a visit to tips.us revealed that Galena was one of the many companies paying DreamTeam "affiliate" MissionIR. Mr. Gravitt thus concluded that "MissionIR" had been promoting Galena's stock. The article was released to premium Seeking Alpha subscribers on January 31, 2014, and to the public on February 1, 2014, and provided in relevant part:

**Paying Companies for Stock Promotion and Significant Insider Selling are Major Red Flags**

When I first started investing in/trading biotech stocks, I was fortunate enough to have several trading mentors impart valuable insight and words of wisdom that has helped contribute to my success. These "words of wisdom" included a warning about stocks that are constantly "pumped" over the internet.

As outlined in a March 2012 article by *Seeking Alpha* contributor Michael Morhamus, GALE's moves higher can be partially attributed to heavy promotion of the stock via the internet. After reading the article, I thought it brought up some interesting points and additional research into the matter was

warranted. Needless to say, I came across some noteworthy pieces of information as it relates to Galena's stock being "promoted" via various outlets.

Stockpromoters.com is a website that (among other features) allows users to type in a company symbol and see whether or not they are involved in any current promotions and if they are, how much they paid for it. A search for "GALE" yielded results that certainly validate the claims made in the aforementioned article. According to the website, there have been 27 different instances of GALE being "promoted" since March 2012. I am not suggesting that this is good, bad, or indifferent. I am simply pointing out some of the information I came across.

However, further investigation revealed that Galena was paying for these promotions. This, for me, is definitely a red flag.

According to a disclaimer found on the tip-us website, MissionIR received compensation from "GALE for 240 days of advertising, branding, marketing, investor relations and social media services provided by MissionIR and affiliate DreamTeamGroup Business Brands."

This potentially explains a part of the massive increase in the company's SG&A Expenses (obviously a large part of the increase was due to the Abstral launch).

148.    On February 3, 2014, the next trading day, Galena's stock price fell on heavy volume from $5.27 to $4.22, or about 20%.

149.    The next major disclosure came on February 12, 2014, during trading hours, when journalist Adam Feuerstein reported that he had uncovered Galena's deceptive scheme:

NEW YORK (TheStreet) -- Two articles touting Galena Biopharma (GALE) were removed from *Seeking Alpha* Monday because they were written by the same person using different aliases.

This is the second time *Seeking Alpha* has been forced to take action against individuals using multiple aliases to tout Galena, a small drug developer with a breast cancer vaccine in a phase III study. In January 2013, the investor Web site removed five articles promoting Galena written by the same individual under three different pseudonyms.

The most recent incident is more serious and potentially damaging because of evidence linking Galena to a stock-promotions firm which wrote and published the articles on *Seeking Alpha*. The articles were part of a broader, coordinated "brand awareness campaign" designed to boost Galena's stock price, according to a document obtained by *TheStreet*.

Aided by this promotional campaign, Galena shares tripled in value from this summer. Coincidence or not, Galena insiders have made millions of dollars by selling company stock in January.

Galena did not respond to phone calls and emails seeking comment.

In July 2013, Galena paid $50,000 to a subsidiary of The DreamTeam Group for 240 days of "advertising, branding, marketing, investor relations and social media services," according to a disclaimer on The DreamTeam Group's Web site.

Update: Following publication of this story, DreamTeam Group removed the Galena compensation disclosure from its web site. Here is the screen shot disclosing Galena's payment to DreamTeam Group:

- GALE: MissionIR, an affiliate of DreamTeamGroup, received $50,000 from GALE for 240 days of advertising, branding, marketing, investor relations and social media services provided by MissionIR and affiliate DreamTeamGroup Business Brands. Please read entire MissionIR Disclaimer for FULL Compensation Disclosures.

Publicly traded companies routinely pitch their stock to new investors, but some of DreamTeam's marketing tactics appear to resemble stock promotion schemes which run afoul of standard investor relations practices. Among its other services, DreamTeam Group operates more than two dozen investor Web sites with names like "Home Run Stocks," "Touchdown Stocks," "Quality Stocks," and "Tout Sheet." The Web sites entice investors with stock picks that can "trade for at least a 100% profit."

All the stock picks touted on these DreamTeam Web sites, including Galena, are paying clients -- a fact omitted from the Web sites unless someone clicks on a small disclaimer link.

Galena was promoted on many of the DreamTeam stock-touting Web sites to create "market buzz about the company to a new group of investors," according to a DreamTeam document, "Galena Biopharma Case Study: Investor Awareness Campaign" obtained by *TheStreet*.

As part of this campaign, DreamTeam published favorable articles about Galena on *Seeking Alpha* on Aug. 7, 2013 and Nov. 22, 2013, according to the case-study document. But the articles were written under aliases and make no mention of DreamTeam or its paid marketing relationship with Galena. Instead, they're written from the perspective of individual investors recommending an investment in Galena to other readers of *Seeking Alpha*.

On Nov. 22, "Kingmaker" published a similar article on *Seeking Alpha* titled, "Galena Biopharma Continues to Develop a Deep Pipeline of Products." Neither article disclosed a financial relationship with DreamTeam Group or Galena.

Both articles were removed from *Seeking Alpha* on Monday because they were written by the same person.

"We pulled the Aug. 6 and Nov. 22 articles. Upon investigation, the contributor was in violation of our Terms of Use because 'Kingmaker' and 'Wonderful Wizard' were the same person but failed to tell us so," said *Seeking Alpha* Vice President of Content and Editor in Chief Eli Hoffman.

*Seeking Alpha* was unable to determine if the author was paid by DreamTeam Group to write the two articles on Galena, added Hoffman. Hoffman would not disclose the real identify of the author publishing under the "Kingmaker" and "Wonderful Wizard" aliases.

Page 53 – COMPLAINT

The DreamTeam Group promoted Galena's stock in other ways than just publishing *Seeking Alpha* articles.

"By December 20, 2013, DTG has published a total of 50 unique GALE-centered blogs that were distributed throughout the DTG network and a number of investor-oriented community site on the Internet such as StockHouse, StockTwits, Seeking Alpha and Wall Street Cheat Sheet," DreamTeam explains in the document obtained by *TheStreet*.

DreamTeam also employs people who promote the stocks of paying clients on message boards, Facebook and via Twitter, according to the document.

DreamTeam Managing Partner Michael Andrew McCarthy did not respond to a message left on his cell phone.

All that DreamTeam promotion worked wonders for Galena's stock price, which tripled in value from $2 per share in July 2013 to almost $7.50 in the middle of January. DreamTeam's contract for eight months of work with Galena ends this month.

Galena CEO Ahn unloaded $2.8 million in company stock in January, according to SEC filings. Director Steven Kriegsman, who's also the CEO of Cytrx (CYTR_), pocketed $2.1 million from the sale of Galena stock in the same month, according to SEC filings. Other Galena executives and directors have also been selling shares.

Cytrx is also a DreamTeam Group client, paying $65,000 for a year's worth of stock promotion, according to a disclaimer on DreamTeam Group's Web site.

The timing of the Galena insider sales may or may not be related to the end of the promotional work being done by Galena. In a recent published interview, Ahn said he sold part of his Galena holding to "diversify for my family."

150.    On February 12, on heavy volume, Galena's stock price fell from $5.22 to $4.26, or 16.3%, damaging investors such as Riley.

151.    In an email sent 3:25 PM PT on the 12th – within hours of Mr. Feuerstein's article – Galena fired DreamTeam. Shortly thereafter, DreamTeam began attempting to destroy all evidence of its relationship with Galena and CytRx. DreamTeam deleted the disclaimer referenced in Mr. Feuerstein's article from its website, as well as almost all Galena and CytRx articles it had published on its websites.

152.    On February 13, 2014, after trading hours, the website Buyers' Strike posted an expose of DreamTeam. Buyers' Strike visited DreamTeam's purported offices located at 7399 North Shadeland Avenue, Indianapolis, IN 46256, and found an empty storefront.

153.    On February 14, 2014, during trading hours, Shawn Vincent (an analyst working for a private equity firm) published an article on Seeking Alpha attributing Galena's stock price performance since November 2013 to DreamTeam's promotional efforts.

154.    Also on February 14, 2014, during trading hours, Galena published an open letter to its investors written by Defendant Ahn. The letter, though styled as a rebuttal of Mr. Feuerstein's article, actually admitted that Galena had engaged DreamTeam:

> The only facts in Mr. Feuerstein's most recent article that are remotely accurate are that Galena previously engaged the DreamTeamGroup and that insiders at the company, including me, divested shares in mid January.

155.    On February 14, 2014, on heavy volume, Galena's stock price fell from $4.36 to $3.73, or 14%, damaging investors such as Riley.

156.    On March 13, 2014, during trading hours, analyst Pearson published an expose of DreamTeam's promotions on Seeking Alpha. Focusing on CytRx Corporation, Mr. Pearson's expose first revealed to the markets that Defendant Kriegsman (as CytRx's CEO) had edited at least one purported DreamTeam article before publication.

> A few weeks ago I received an email and subsequent phone calls asking me to be a paid stock tout for an IR firm called The DreamTeamGroup. The sender first informed me about an article he wanted on CytRx Corp.… He clearly had no idea what he just stumbled into by contacting me of all people. The individual ultimately revealed his name to be Tom Meyer. He later informed me that the IR form he works for was the DreamTeamand that he worked closely with the head of Dream Team, Michael McCarthy.… I was offered $300 per article, but was also told there were two conditions. First, management [] would have to sign off (and edit) the articles. Second, I would not be allowed to disclose that I was getting paid.

157.    As evidence of Galena's (and CytRx's) editorial control over DreamTeam's media reports and articles, Mr. Pearson released his emails with DreamTeam members which discussed the importance of final Company approval over these materials. For example, on January 18, 2014, Tom Meyer wrote to Mr. Pearson from his jjohnson19000@outlook.com email address, stating:

> Hi Rick
>
> Thanks for getting back to me so soon. I work for an IR firm and I have a team that I manage. So when the firm has a new client, they will ask me to start getting some articles published on various sites. And then my team will get started on it.
> We typically cover biotech companies but occasionally will have some others as well. When I give you an assignment, you will type up the draft and then send back to me so I can get the company's approval. I will send you back the edited version and then you can publish. Once published, I will pay you $300. We send checks to our guys every 2 weeks.

158.    Similarly, Mr. Pearson published an email between Pearson and Meyer in which they specifically discussed an article touting Galena which was written by DreamTeam-paid author John Mylant under the auspices of impartial investment advice. On February 6, 2014, Mr. Pearson asked Mr. Meyer:

> [O]n GALE, I thought that John Mylant did a great piece this week, but he did not address the short attack. [D]id the company approve his piece?

To which Mr. Meyer responded:

> John wrote his article before the short piece came out. It was published after but written before. The company just took a long time to approve it. Wouldn't have been fair to make him go back and add something else. He's been working for me 4 months or so. He's pretty good, gets things written pretty quick.
>
> GALE is just slow my friend.  I chatted with Michael [McCarthy – Head of DreamTeam] last night and they're still pending.  I can't make them approve when I say, it's up to them unfortunately.

159.    That day, on heavy volume, Galena's stock price fell from $3.25 to $3.02, or 7.1%, damaging investors such as Riley.

160.    On March 17, after close of trading, Galena filed its annual report on Form 10-K for the year ended December 31, 2013. The 10-K disclosed an SEC probe of Galena.

> "In February 2014, we learned that the SEC is investigating certain matters relating to our company and an outside investor-relations firm that we retained in 2013."

161.    Later that night and the following morning, Bloomberg and The Oregonian drew attention to Galena's disclosure of an SEC probe. On March 18, 2014, on heavy volume, Galena's stock price fell from $3.22 to $2.82, or 12%, damaging investors such as Riley.

162.    On May 14, 2014, the market got a glimpse into the breadth of the SEC's investigation. That day, in an article titled "SEC Casting Wide Net in Galena Investigation," Mr. Feuerstein revealed that Lion Biotechnologies, Inc.—which shares a director, Sanford Hillsberg, with Galena—had recently disclosed that it had received a subpoena in the SEC investigation of Galena. Galena's stock price fell from $2.37 on May 14 to close at $2.17 on May 16, or about 8.4%, damaging investors such as Riley.

C.  **Additional facts showing Defendants' false statements were material.**

163.    In addition to the facts pled above, more facts show that the false statements alleged above were material.

i. **Galena has a long-standing relationship with both Lidingo and DreamTeam, and has timed its stock offerings to coincide with their illicit stock promotions**

164.    Galena's relationship with Lidingo and DreamTeam goes back years. In October 2008, DreamTeam began posting positive articles about Galena on its blog. It continued posting

Page 57 – COMPLAINT

articles on its blog, for example, announcing Galena's annual investor conference,[10] its inclusion

on the Russell Microcap index,[11] and a Galena licensing agreement.[12]

165.    In late 2011, Lidingo was recommended to Defendant Hillsberg.  Hillsberg then

suggested that Ahn consider it as an investor relations firm for Galena, and on January 4, 2012,

Galena retained Lidingo.  Lidingo's contract called for it to review Galena's research and

development plan, provide strategic input on investor relations, generate independent coverage

of Galena through third parties, and distribute key press releases and news items through its

network. (Ex. 36)

166.    Galena's explicit purpose in retaining Lidingo and DreamTeam was to boost

Galena's stock price, as confirmed by correspondence between Defendants. On November 12,

2012 to Defendant Ahn, Lidingo's managing member Kamilla Bjorlin pitched its premium email

promotion services for $20,000 for the rest of the year. Bjorlin stated that Lidingo's previous

promotions on October 3, 17, 25, and 31, of 2012, had each increased Galena's stock price and

volume.[13]   Bjorlin guaranteed that if Galena's stock price did not increase by at least 25% by

year end, Lidingo would refund Galena's $20,000 fee. Ahn quickly agreed to pay the $20,000.

(Ex. 62).   Similarly, when Lidingo sought to be retained by Galena in July 2013, its pitch was

simple: Galena's stock price was low, and Lidingo had helped other companies raise theirs.

Lidingo did not mention any other reason to hire it. (Ex. 170). Similarly, on July 31, 2013,

DreamTeam sent an email containing nothing more than Galena's stock price since the

beginning of DreamTeam's promotion on July 25. Because the stock price had increased, Ahn

---

[10] <http://dreamteamnetwork.com/blog/rxi-pharmaceuticals-corp-rxii/rxi-pharmaceuticals-corp-rxii-to-webcast-investor-event-2>

[11] <http://missionir.com/blog/small-cap-news/rxi-pharmaceuticals-rxii-added-to-the-russell-microcap-index/>

[12] < http://missionir.com/blog/small-cap-news/rxi-pharmaceuticals-corp-rxii-acquires-license-to-advirna-technology/>

[13] The statement was accurate, except that Galena's stock price had decreased by about 2% on the 31st.  Even with the decrease on the 31st, Galena's stock price increased 18.5% in October 2012.

responded that DreamTeam was off to a "Great start!" (Ex. 75). Galena Officer Defendants and Lidingo Defendants regularly measured the promotion's success based on Galena's stock price (and, relatedly, the volume of transactions in Galena's stock) and do not appear to have used any other metric. (Exs. 58, 61, 66).

167.    Since 2012, Galena has timed its offerings to coincide with stock promotions Having hired Lidingo in January 2012, Galena sold $12.75 million of its stock in April 2012. Having paid for premium Lidingo services in November 2012, Galena sold $24.25 million of stocks and warrants in a public offering in December 2012.  Later, when it retained Lidingo and DreamTeam in July 2013, Galena sold $35 million of its stock in a secondary offering in September 2013.

168.    Galena Director Defendants knew of Lidingo's engagement.  Galena had a policy requiring that its Audit Committee ratify all contracts with a value exceeding $100,000.  The Audit Committee ratified Lidingo's engagement at its November 8, 2012 meeting.  (Ex. 169).  At the January 16, 2014 board meeting, presentation materials highlighted that Lidingo was a vendor with a contract greater than $100,000.  (Ex. 28).  The Galena Director Defendants ratified the Lidingo contract at that meeting.

169.    Galena terminated its contract with DreamTeam only after the relationship was exposed by whistleblowers.

170.    Galena terminated the relationship with Lidingo on April 3, 2014, only after the SEC investigation began and subpoenas exposed Lidingo's relationship with Galena.  (Ex. 115).

      ii.    **Defendants' fraudulent promotion causes soul-searching in the investment community**

171.    On February 13, 2014, journalist John Kimelman published an article on Barron's titled "When Investor Websites Get Duped: Seeking Alpha's policy of granting anonymity to

writers of stock stories can have troubling consequences", noting Mr. Feuerstein's article, and distinguishing Barron's because it did not rely on anonymous contributors.

172.    A March 20, 2014 article titled "At Financial News Sites, Stock Promoters Make Inroads," on Fortune summed up the events, in part, as follows:

> While not all of the facts are clear, the websites admit that they were duped. In the past few weeks, more than 100 articles have been pulled from Seeking Alpha, Wall St. Cheat Sheet, and other websites that have been caught up in the stock promotion scheme.

173.    Then, on May 27, 2014, Seeking Alpha was forced to run an editorial apologizing to its readers for the Exchange Act Defendants' misconduct called, "What Seeking Alpha Is Doing to Prevent Paid Stock Promotion." In an effort to "identify and prevent stock manipulation on Seeking Alpha in response to recent discoveries," Eli Hoffman, Seeking Alpha's Editor-In-Chief, explained that:

> Recently, our editors were forced to remove a number of articles from *Seeking Alpha* after we discovered that their authors had been compensated by stock promoters to publish positive articles on specific stocks. In their disclosures, the authors lied – explicitly stating that they were not receiving third-party payment for their articles. To be clear: *Seeking Alpha* does not allow paid stock promoters or IR firms to submit articles about stocks with which they have a relationship. We are grateful to Richard Pearson for his outstanding undercover work in unearthing foul play on *Seeking Alpha* and other investing websites, and for sharing his research with us proactively so that we could deal promptly with noncompliant authors. You can read Richard's recent articles on this topic here and here.

174.    Further, *Seeking Alpha, Wall Street Cheat Sheet* and *Forbes* highlighted the manipulative and deceptive conduct of Galena, Ahn, Bernarda, and DreamTeam Defendants by removing the promotional articles they had published from their websites. On March 20, 2014, Mia Carbonell, a spokesperson for *Forbes* confirmed that the articles had been removed and that Meyer would no longer contribute to the site because, "[a]fter careful consideration, we determined that the content did not meet *Forbes'* editorial guidelines."

175.    Analysts concluded that the promotional campaign was material. On February 18, 2014, in response to the revelation that Galena had engaged DreamTeam to tout its stock, an analyst at investment bank Cantor Fitzgerald lowered its price target, and downgraded Galena from Buy to Sell, citing the stock promotion campaign as her reason. Notably, there are two intermediate steps between Buy and Sell, meaning that the Cantor Fitzgerald analyst found the news was very material and warranted a severe downgrade.

**D.  Additional facts probative of scienter.**

176.    In addition to the facts pled above, more facts show that the false and misleading statements and omissions and additional conduct in furtherance of the manipulative and deceptive scheme perpetuated by defendants were made with scienter.

> i.  **Galena Officer Defendants, Lidingo Defendants, and DreamTeam Defendants understood that the stock promotion campaign violated the securities laws**

177.    Galena knew Lidingo paid its "writers" for positive Galena articles. Lidingo's contracts called for Galena to cover its expenses, which included payments to Lidingo's writers. In an email sent on April 7, 2012, Bjorlin asked Madeline Hatton, Galena's Manager, Operations & Administration, whether Galena's check had been sent, stating that "the writers were due to be paid on April 5." Ahn signed the check. (Ex. 59).

178.    Lidingo's emails to Galena about Lidingo Defendants' activities disclosed obvious and brazen violations of the securities laws.  Lidingo regularly provided as-published articles or sent email blasts to Ahn, sometimes at his request, which never disclosed that they were paid promotions. (Exs. 67, 69).  Sometimes Dunlap was included in these emails. (Exs. 84, 85).  Ahn knew that the articles violated the securities laws; in fact, after Feuerstein's article, he falsely told Galena's Special Committee that he never reviewed Lidingo's work.  The Special Committee itself concluded that he probably lied.  Beyond the articles, Lidingo's emails to

Galena disclosed practices that clearly violated the securities laws. In an email sent to Ahn on January 18, 2012 (mere weeks after being retained), Lidingo stated that it "ha[d] published original articles by our writers on various websites and have distributed them directly to a targeted audience of several hundred thousand in the investment community. Additionally, we have leveraged other news and utilized [third-party] message boards and forums to increase traffic to those sites. ***Message boards have been monitored closely and will continue to be worked throughout campaign to maintain a positive tone.***" (Ex. 56) (Emphasis added).

179.    Ahn understood that Lidingo offered one advantage over a Galena-run investor relations campaign: deniability. For example, on April 19, 2013, after Galena demanded that Lidingo lower its rates, Defendant Bjorlin reminded Defendant Ahn of one advantage in continuing the campaign (rather than doing investor relations in-house): "keep in mind we offer a layer of protection; a safer more efficient option." (Ex. 70). Ahn responded to this email by saying he would discuss it with the Galena "team" and Bernarda. (*Id.*). In exchange for Lidingo taking on significant "risk" in an effort to provide a "layer of protection," Galena provided a lavish money payment and stock options to Lidingo, effectively yoking the two companies together. Bernarda, with years of investor relations experience and knowledge of Lidingo's past work for Galena, knew or should have known of the illegality of Lidingo's work in 2013-2014.

180.    DreamTeam's communications also suggested that the promotion violated the securities laws. A marketing brochure created by DreamTeam for potential clients provides:

> [DreamTeam drafted] Articles are directed towards sophisticated investors who understand complex evaluation of investments, and we publish our articles where these investors commonly go to seek investment ideas – ensuring that the highest quality content about YOUR company gets seen by the right people. We use our own writers to generate content, and we utilize our network for distribution. We reach a vast audience through our partners and media contacts, and for those who do their own research, it certainly helps to have positive information coming from multiple sources. *Seeking Alpha*, which boasts more than 1 million members, is

the No. 1 outlet we use to circulate this kind of detailed information for our clients." [Using *Seeking Alpha*], we've received more than 6,500 views for a single article, and our articles are also featured on many prominent sites, including Yahoo! Finance.  We not only craft superior content – we maximize its effectiveness on your behalf.

(*In re: Galena Biopharma, Inc. Securities Litigation*, Case No. 3:14-cv-00367-SI, Consolidated

Class Action Amended Complaint, Ex. C (Dkt. No. 59)).

181.    In contrast to DreamTeam's promotional materials, *Seeking Alpha* does not

permit paid promotional articles, and mandates that all articles must disclose that they are not

paid promotions. Thus, DreamTeam's promotional materials boasts of the impact of its fraud.

182.    Galena's officers knew about fraudulent articles.  On November 26, 2013,

DreamTeam sent Bernarda a list of the articles it had published on Seeking Alpha since its

retention. (Ex. 10).  The list included 18 articles and provided links to each article, all of which

bore the false Seeking Alpha Disclaimer.  Moreover, the email itself provided the alias used in

publishing each article, and provided a link to the author's profile page.  None of the authors'

profiles disclosed that they were pseudonyms used by DreamTeam agents. Galena knew the

claims made on the author pages were false – for example, it knew that Kingmaker, Stock

Whisper, and Wonderful Wizard were not successful professional investors, because it knew that

they were alter egos used in their own promotional campaign.

183.    Indeed, Galena and DreamTeam Defendants already had run afoul of *Seeking

Alpha*'s policy against paid promotions.  In December 2012 and January 2013, at least five

bullish Galena articles were published on *Seeking Alpha* under aliases Elegant Trading,

Momentum Trading, and Thomas Option Hunter, all of which were DreamTeam aliases.  The

five articles, all of which touted Galena's stock, were in fact authored by a single individual.

"Momentum Trading", "Elegant Trading", and "Thomas Option Hunter" were all aliases used by

DreamTeam.  Upon discovering that the articles all were written by the same person, *Seeking Alpha* removed them and *Seeking Alpha* also contacted the author.[14]  After the articles were removed, "Momentum Trading", "Elegant Trading", and "Thomas Option Hunter" disappeared.

> ii.    **While the stock promotion scandal unfolds, Galena Officer Defendants repeatedly lie to investors, and Ahn is fired for cause**

184.    Galena Officer Defendants repeatedly lied to conceal both the promotional campaign and their role in it.

185.    On July 10, 2013, Bjorlin of Lidingo emailed Ahn, commenting on Galena's poor stock price performance, and offered Lidingo's services to boost it.  Ahn forwarded Lidingo's email to Bernarda. Lidingo boasted that it had partnered with Forbes, and that its promotions had increased other clients' stock prices. (Ex. 170).  Thus, Bernarda knew that Ahn was still in contact with Lidingo about the possibility of continued contractual relations.

186.    On August 1, 2013, Ahn renewed the contract with Lidingo.  Two Galena executives – Ms. Hatton and Bernarda – claimed to the Special Committee that Ahn falsely told them the contract with Lidingo was not renewed.  But given Bernarda's position as Vice President of Investor Relations and Marketing, her prior work with Lidingo at Galena in 2012 to promote Galena's stock price, and her presence at Galena board meetings in October 2013 and January 2014 where key marketing and investor relations campaigns were discussed (when 90 percent of Galena's investor relations spending was to Lidingo and DreamTeam), including the board's ratification of the Lidingo contract at the latter meeting, there is evidence that Bernarda knew about the Lidingo contract and campaign in 2013-2014.  Bernarda's statements that she did not know about Lidingo's campaign is as incredulous as her statements to Tiberend in December

---

[14]  <http://www.thestreet.com/story/11823518/1/seeking-alpha-author-used-multiple-aliases-totout- biotech-stocks.html.>

2013 that she did not know Tom Meyer, despite having reviewed or approved Meyer's articles for DreamTeam, which are discussed in more detail below.  (Ex. 99).

187.    Ahn and Dunlap concealed from Galena's board that Ahn had awarded stock options to Lidingo.  Ahn did not have authority to issue stock options, but nonetheless executed the consulting agreement that provided options to Lidingo.  Ahn did not consult the Board or Galena's general counsel and also kept the contract a secret.  Ahn's Executive Assistant kept all Galena contracts.  When Dunlap asked her to locate the Lidingo stock options agreement, she told Dunlap on November 13, 2012, that she had searched through the entire folder, but had not found any Lidingo agreement. (Ex. 82).  Dunlap then found the agreement in Ahn's own files, noting that it provided Lidingo with stock options.  Dunlap also was included in email correspondence with Ahn and Lidingo that discussed the email campaign and specific blasts as well as information about how Lidingo depended on the stock options to "generate income," which should have raised red flags about the nature of the campaign and Lidingo's motivations. (Ex. 85).  Ahn did not disclose that he had awarded Lidingo stock options either in a November 22, 2013 Compensation Committee meeting where it granted options to employees, or in a January 16, 2014 board meeting when the board ratified the contract with Lidingo, minus the stock options. (Exhs. 22, 28).  Dunlap and Bernarda attended both meetings, but neither raised Ahn's misconduct with the Board.  Doing so may have implicated their own role and knowledge of the stock promotion scheme.

188.    On December 6, 2013, third party investor relations firm CSIR Media Group offered to write paid promotional articles for Galena.  Bernarda forwarded the article to Tiberend.  On December 12, 2013, Tiberend responded:

1. Galena has no shortage of coverage on the leading blogs (SeekingAlpha, Motley Fool), all the result of genuine contributor interest in the company's story. Thus, paying for more isn't necessary.

2. We don't necessarily discount pay-for-play on the whole, but what CSIR Group and other 'IR Firms' are doing with these financial blogs is **bordering on fraud. They are asking for fees but not disclosing that the resulting article was paid for by the company. They generally hide this connection** (you pay CSIR Group; they pay a blogger), but I think this will eventually get noticed by regulators and trouble could ensue.

(Ex. 99) (emphasis added).

189.    The following Monday, December 16, 2013 Tiberend's Claire Sojda, replying to the December 12 Tiberend email, emailed to Bernarda an article discussing Galena Defendants published under Defendant Meyer's own name.  Tiberend asked Bernarda to read the article, complimented the author, and asked Bernarda whether she had talked to him.  Bernarda had, in fact, approved an article from "Tom Meyer" on December 3, 2013.  Moreover, since it was DreamTeam's practice to seek approval of all articles from Ahn or Bernarda before publication, Bernarda likely had approved the very article Tiberend emailed to Bernarda. Despite this familiarity with the author and article, Bernarda denied knowing who Defendant Meyer was. (Ex. 99).

190.    When analysts called attention to the insider stock sales, Ahn lied about them, too. In the fawning interview published by Seeking Alpha on February 4, 2014, Ahn stated that he had sold his shares to diversify his stock holdings.  This was false because Ahn had sold shares to cash in on DreamTeam's touting of the stock and other insider information.  Ahn also stated that "[t]here are no ongoing SEC investigations. Period." In fact, Galena would later admit that it had learned in February 2014 that it was the target of an SEC investigation, but Ahn never retracted or corrected his statement.

191.    In a further interview on February 14, 2014, Ahn stated that insiders had sold stock in January 2014 because they had been prevented from selling stock for nine months prior.[15]  In fact, emails sent to all insiders including Ahn indicate that Galena's blackout period had only begun on December 2, 2013.  Ahn's statement thus gave investors the false impression that the stock sales were sales that insiders had been contemplating for a long time rather than the dump following the DreamTeam pump.  In the same interview, Ahn falsely stated that he'd been told the Seeking Alpha articles were written by an independent writer, rather than the DreamTeam. In fact, DreamTeam had sought Ahn and Bernarda's review and approval of all of the articles, so he could not have believed that they were written by an independent writer.

192.    In an open letter addressed to shareholders dated February 14, 2014, Ahn was quoted as saying that "[t]he only facts in Mr. Feuerstein's [February 12, 2014] article that are remotely accurate are that Galena previously engaged [DreamTeam] and that insiders at the company, including me, divested shares in mid January." There were other facts revealed in Mr. Feuerstein's articles that Defendant Ahn knew to be true from Mr. Feuerstein's article, including:

(a)    That Galena had launched a broad, coordinated "brand awareness campaign" designed to boost Galena's stock price.

(b)    That DreamTeam had published 50 unique Galena-centered blog posts.

(c)    That the authors of the August 6 and 22 articles were the same person.

(d)    That DreamTeam had employed people to promote Galena's stock on message boards, Facebook, and Twitter.

---

[15] Nick Budnick, Lake Oswego firm Galena Biopharma defends itself over marketing campaign, insider sell-off, *The Oregonian*, February 14, 2014, available at
<http://www.oregonlive.com/politics/index.ssf/2014/02/lake_oswego_firm_galena_biopha.html>.

193.    In an article published March 7, 2014, Ahn was quoted as saying:

"I don't consider [*Seeking Alpha*] a credible source of news. Nor do I pay attention to it. Well, look I have to pay attention to it... Let me put it this way, it has the equivalent status of social media.

Ahn's statement was false because (a) in fact, Galena monitored Seeking Alpha closely, and would issue correction demand letters and file lawsuits shortly after negative press there, and (b) Galena admitted in a complaint it itself filed that Seeking Alpha is "a leading website for financial news [and it is] extremely influential [and] relied on by market analysts, and viewed by millions of investors worldwide". *See* ¶¶ 223-225, below.

194.    In an article published March 17, 2014, Ahn was quoted as saying:

Asked whether the company [Galena] reviewed the [DreamTeam articles before they were posted, Ahn responded, 'No, absolutely not ... The company did not review any of their activities.[16]

195.    In the same article, Ahn was also quoted as saying that he had no idea the *Seeking Alpha* articles were the result of the DreamTeam marketing campaign.

196.    Both statements were false exculpatory statements because Ahn personally reviewed many of the articles before they were published, and he or Bernarda reviewed all the articles before they were published.

197.    In the same March 17, 2014, article, Ahn was quoted as saying about DreamTeam that "we no longer use them and [Feuerstein's article] has nothing to do with it. We tried them for a few quarters. We rated them as moderately effective if at all, and we decided not to continue." In fact, emails released by Galena show that Ahn had fired DreamTeam because Mr. Feuerstein discovered its unlawful promotion:

---

[16] Nick Budnick, California investor takes aim at stock promoting, reports Lake Oswego biotech firm, The Oregonian, March 17, 2014, available at < http://www.oregonlive.com/health/index.ssf/2014/03/california_investor_takes_aim.html>.

(a)        Monday February 10, 2014, at 9:25 A.M. PST: Adam Feuerstein first contacts Defendant Bernarda about DreamTeam. Defendant Bernarda immediately forwards email to Tiberend, and by 10:45 AM PST Galena has held a conference call with Tiberend. Tiberend forwards the DreamTeam Galena case study to Bernarda at 10:40 AM PST. (Ex. 104).

(b)        Less than an hour later, February 10, 2014, at 11:36 A.M. PST: Galena puts a hold on all DreamTeam articles. (Consolidated Class Action Amended Complaint, Ex. D, Email from Defendant Meyer to Richard Pearson).

(c)        Less than an hour later, on February 10, 2014, at 12:42 PM PST: DreamTeam seeks an opinion from Greenburg Traurig about disclosure of paid promotions. DreamTeam falsely represents to Greenburg Traurig that it is concerned about whether it must disclose paid promotions in the future. (Ex. 71).

(d)        February 11, 2014, at 9:42 AM PST: Greenburg Traurig unambiguously states that "if you are describing the stock of a company, you must disclose the amount you are being paid or you are violating the securities laws." (Ex. 71).

(e)        February 11, 2014 at 10:45 AM PST: DreamTeam reports Greenburg Traurig's conclusion to Ahn.  DreamTeam's email indicates that DreamTeam's request came from Galena, as DreamTeam states that "I just got this [GT response] back this morning." (Ex. 71).

(f)        February 12, 2014, at 9:45 AM: Feuerstein's article exposing Galena's relationship with DreamTeam is published.

(g)    February 12, 2014, at 12:25 PM PST: Galena fires DreamTeam. The

email firing DreamTeam provides "[t]hank you for the conversations this week as we

worked through the issues." (Ex. 106).

198.    Moreover, Galena had been hiring DreamTeam and Lidingo since 2008, not

merely for a few quarters, had paid them hundreds of thousands of dollars, not a marginal

amount, and had timed all of their recent capital raises to follow on the heels of stock promotion

campaigns.  Thus, it is not true that Galena rated DreamTeam "moderately effective."

DreamTeam in fact had characterized its stock promotion campaign as the "Galena success

story."

199.    On February 17, 2014, Galena's Board convened a so-called Special Committee.

The Special Committee completed its report on July 15, 2014.

200.    The Special Committee's report documented certain of Ahn's misconduct,

including:

(a)    It concluded that Ahn had paid Lidingo stock options in violation of

company policy;

(b)    It concluded that Ahn may have breached his fiduciary duty;

(c)    It concluded that Lidingo likely violated the federal securities laws;

(d)    It concluded that Ahn had lied to the Special Committee;

(e)    It concluded that Galena's minutes for the January 16 meeting that

purportedly authorized selling Galena stock was "inconsistent" with the facts, raising an

inference that the minutes had been doctored.

201.    On August 11, 2014, in an earnings conference call, Ahn announced that the

Special Committee had completed its investigation, but that the Board awaited its report.

202.    On Monday, August 18, 2014, Galena's board held a special meeting.

203.    On August 20, 2014, Feuerstein announced that a source close to Galena had informed him that Ahn had been fired for cause.  At the time, neither Galena nor anyone else had announced that Ahn had left the company.

204.    On August 21, Galena issued a press release claiming that Mark Ahn "resigned" as President and CEO.

205.    On August 21, 2014, Ahn declined to confirm or deny that he had been fired for cause.[17]

206.    On August 22, 2014, Galena filed a current report with the SEC. The Current Report falsely stated that Ahn had "resigned [] effective August 20, 2014," and an accompanying press release added that he had resigned "to pursue other long held personal and professional goals."  But the current report disclosed that "[i]n accordance with the terms of his employment agreement [] no severance or other compensation is payable to Dr. Ahn."  Ahn's employment agreement dated March 31, 2011, called for him to receive severance unless he was fired for cause or resigned without good reason.

207.    Feuerstein's source is reliable, since it accurately informed him that Ahn had been fired for cause at an August 18 board meeting before anyone outside Galena knew that he had left the company at all. Further, Galena's claim that Ahn had resigned is inconsistent with Ahn's not receiving any severance.  Finally, the claim is implausible.  Ahn's termination closely followed the Board's receipt of the Special Committee report blaming Ahn.  And, Ahn's termination was effective two days after he informed the Board of it; it is unlikely that a CEO

---

[17] Nick Budnick, Galena Biopharma, Lake Oswego biotech firm under federal investigation, expected to announce CEO's departure, The Oregonian, August 20, 2014, available at <http://www.oregonlive.com/health/index.ssf/2014/08/galena_biopharma_lake_oswego_b.html>

would offer or a Board accept such a short-fused termination, still less to pursue "other long-held personal and professional goals."

208.    Thus, Ahn was fired for cause at the August 18 meeting, but Galena and Ahn both tried to downplay or deny that the firing was for cause.

### iii.    Kriegsman had knowledge of DreamTeam's practices and retained DreamTeam for similar stock manipulation campaigns

209.    Defendant Kriegsman, a director of Galena, also is CEO and President of CytRx, Galena's former parent company.

210.    In the fall of 2013, CytRx retained DreamTeam to conduct a promotional campaign to raise CytRx's stock price. DreamTeam employed the same methods it used for Galena: blanketing social media and publishing articles that failed to disclose that they were paid promotions to create an impression of a broad base of supportive investors.

211.    CytRx's stock price rose from $2.25 on November 1, 2013 to $8.35 on January 30, 2014.  CytRx then sold $74.5 million of its shares in an offering that closed on February 5.

212.    Kriegsman signed an underwriting agreement, filed with the SEC on January 31, 2014, that provided:

> No *Price Stabilization or Manipulation; Compliance with Regulation M.* The Company has not taken, directly or indirectly, any action designed to or that might cause or result in stabilization or manipulation of the price of the Shares or of any "reference security" (as defined in Rule 100 of Regulation M under the Exchange Act (**"Regulation M"**)) with respect to the Shares, whether to facilitate the sale or resale of the Offered Shares or otherwise, and has taken no action which would directly or indirectly violate Regulation M. 202.

213.    On or about January 16, 2014, Kriegsman was interviewed by DreamTeam.

214.    Pearson wrote several articles about CytRx and one about Galena.  Before his Galena article could obtain management approval, however, Adam Feuerstein's article appeared. After that occurred, Galena was no longer interested in Pearson's article.

215.    Kriegsman's CytRx, however, was still interested in publishing Pearson's paid puff pieces. Pearson's articles were sent to CytRx through Meyer; when Meyer returned the articles, they were heavily edited. Using word's track-changes feature, Pearson determined that the edits had been made by both David Baen, CytRx's VP of Business Development, and Lauren Terrado – Kriegsman's executive assistant.

iv.    **Galliker and Chin have knowledge of DreamTeam's practices and as officers of a biotech company retained DreamTeam to perform similar stock manipulation campaigns**

216.    Galliker and Chin, directors of Galena, are also CFO and CEO of Kindred Biosciences, Inc., a company developing drugs for pets.

217.    In late 2013, Kindred retained DreamTeam.

218.    Kindred held its IPO on December 11, 2013, raising net $56,148,750.

219.    As with Galena and CytRx, Kindred's stock price rose dramatically during DreamTeam's stock promotion campaign, from a close of $11.95 the day of its IPO to a high of $26.50 on February 26, 2014.

220.    In March 2014, Kindred conducted a follow-on offering, raising net proceeds of $50.5 million, at a price of $18 per share.

221.    In connection with the follow-on offering, Chin represented, in a filing made with the SEC, that:

> Neither the Company nor any of its affiliates (within the meaning of Rule 144 under the Securities Act) has taken, directly or indirectly, any action which constitutes or is designed to cause or result in, or which could reasonably be expected to constitute, cause or result in, the stabilization or

manipulation of the price of any security to facilitate the sale or resale of the
Shares or to result in a violation of Regulation M under the Exchange Act.

222.    Defendant Hillsberg was one of Kindred's lead attorneys in both its IPO and its

follow-on offering.

>        v.    **Galena so values and tracks investor website Seeking Alpha that it sues
>              over comments and articles posted on Seeking Alpha**

223.    In September 2013, Galena filed a complaint against Constantin Ioannides, the

co-inventor of one of Galena's development-stage products. Galena claimed it had been defamed

by three comments Dr. Ioannides left on an article published on Seeking Alpha. In its complaint,

Galena alleged that "Seeking Alpha is a leading website for financial news [and it is] extremely

influential [and] relied on by market analysts, and viewed by millions of investors worldwide."

*Galena BioPharma, Inc. v. Ioannides*, 13-cv-1745-HA, ¶7 (D. Or. 2013). Its opposition to

Dr. Ioannides's motion to dismiss, Galena stated that Seeking Alpha "is very influential in

investment circles, particularly the bio-tech sector." *Ioannides* Dkt. # 19, at 5. Christopher Lilly,

a senior attorney at the law firm TroyGould, similarly declared that Seeking Alpha "is very

influential in investment circles, particularly the bio-tech sector." *Ioannides* Dkt. # 22, at ¶ 2.

Mr. Lilly and Defendant Hillsberg both work out of TroyGould's sole office.

224.    Galena's complaint and briefs attached numerous articles from Seeking Alpha,

each of which made the Seeking Alpha Disclosure. (Compl. Ex. B; *Ioannides* Dkt #22-1 at 1;

# 22-14 at 1; 22-16 at 4). Indeed, it is clear that Galena was monitoring Seeking Alpha. The very

day an article was published there quoting Dr. Ioannides making criticisms of Galena, Galena's

attorney sought to have him retract the quotations. Galena's attorney stated that "Seeking Alpha

has an enormous readership and [the article containing allegedly false and misleading

information] will be picked up and spread even more widely." Dkt. # 22-19, at 3. Galena's

attorney added that "[b]y our calculations, Galena has already been damaged **$20 million** [] by the article" published on Seeking Alpha. (*Ioannides* Dkt. # 22-20, at 1 (emphasis in original).

225.    The September 2013 suit was the second time Galena sued an analyst over a publication in Seeking Alpha. *Galena Biopharma, Inc. v. Propthink, LLC*, BC 496433 (Sup. Ct. of Cal. L.A. Cty. 2012). In the earlier suit as well, Galena reviewed a Seeking Alpha article, which made the Seeking Alpha Disclosure, and attached it as an exhibit. ¶ 104. There, as well, Galena was represented by Mr. Lilly, of Defendant Hillsberg's firm.

> vi.    **Additional facts probative of the liability of the Galena Director Defendants and Insider Trading Defendants**

226.    The New Policy relevant to permissible Galena insider trading provides that "financial performance, especially quarterly and year-end earnings" are presumptively material. The New Policy also provides that insiders may not trade during blackout periods. (Ex. 19). The Old Policy prohibited all insider trading that was not preapproved by the CEO.

227.    On December 2, 2013, Dunlap sent an email to certain Galena insiders including Ahn, informing them that the blackout period for officers and high-level insiders (including each of the Insider Trading Defendants) had begun, and that the recipients must refrain from trading in Galena stock until Galena released earnings in March, 2014. (Ex. 93).

228.    On December 11, 2013, Defendant Dunlap sent another email to Defendant Ahn, reminding him that Galena's blackout period for officers and high level insiders had begun. (Ex. 96).

229.    On January 3, 2014, Defendant Dunlap sent an all-company email, stating that (1) Galena was in a blackout period, and (2) insiders could not trade in Galena stock until 2 days after its earnings were to be released, in March 2014. (Ex. 103).

230.    In violation of company policy, the Insider Trading Defendants sold company stock:

a) While in the possession of material non-public information, namely knowing Galena's 2013 earnings, knowing that Galena was engaged in a campaign to pump its stock price, knowing that the FDA had denied Breakthrough Therapy designation, and knowing that Galena's enrollment of patients for and progress in the Phase 3 trial of NeuVax™ was well behind schedule (the "Inside Information");

b) During a blackout period.

231.    Insider Trading Defendants had material non-public information about the illicit stock promotion campaigns.  Item 19 of the October 11, 2013 board meeting was a discussion of Galena's investor relations and public relations activities, led by Bernarda. (Ex. 21).  Item 21 of the January 16 2014 board meeting was a discussion of Galena's investor relations and public relations activities, led by Bernarda. (Ex. 23).  At the time of both meetings, more than 90% of Galena's investor relations expenses were the payments to DreamTeam and Lidingo. Obviously, Bernarda discussed DreamTeam and Lidingo's activities at these board meetings.  At Galena's January 16, 2014, Board Meeting, the Galena Director Defendants ratified Lindingo's contract with Galena.

232.    Insider Trading Defendants had material non-public information about 2013 earnings.  At the January 16, 2014, Board Meeting, Galena's directors were provided with Galena's 2013 earnings.  These earnings were ultimately released to the public on March 17, 2014.  The 2013 earnings principally derived from sales of Abstral and indicated that Abstral earned around $3.1 million revenue for Galena in the year ending December 31, 2013, after it was launched in October 2013.  Under the New Policy, earnings reports are ordinarily material,

and the 2013 earnings report was no exception.  As evidence of the materiality of the earnings

figures, Galena stock soared initially in after hours trading following the release of the 2013

earnings.  As further evidence of the materiality of the earnings report, Galena had publicized the

significance of Abstral sales to fuel Galena's research and development efforts.  In Seeking

Alpha articles written by DreamTeam agents and reviewed and approved by Ahn and Bernarda,

the Abstral sales frequently were cited as an important source of optimism for investors.  In

Galena officer's public statements, they touted the importance of Abstral sale's to Galena's

success.  For example, when Schwartz assumed the office of CEO, he reiterated the significance

of meeting the goals for Abstral® sales predicted in 2013.

233.    At the January 16, 2014, Board Meeting, Galena's directors were provided with

material non-public information related to the NeuVax™ Phase 3, including current enrollment

numbers (as compared to projected numbers and number communicated to the public) and

setbacks, such as the FDA's denial of Breakthrough Therapy designation. This information about

the NeuVax™ Phase 3 was crucial to the marketplace's evaluation of Galena stock. As further

evidence of the materiality of FDA communications to biotech companies like Galena, consider

the effect that a simple FDA warning letter had on Galena stock in recent months.  In December

2014, Galena received a Form 483 Notice of Inspectional Observations (the "Form 483 Notice")

noting deficiencies pertaining to post-marketing adverse drug experience reporting and current

good manufacturing practices for Abstral and Zuplenz.  When the FDA warning letter was made

public in an SEC filing in its annual report on March 5, 2015, Galena's stock dropped

approximately 10%.

234.    Schwartz participated in the pump and dump scheme by not only selling stock

during the blackout period (on January 30, 2014), but by signing off on the scheme to hide the

insider trading by filing SEC Form 4s for small buys that would be mixed in with insider sales forms. Schwartz sold nearly 20% of his stock on January 30, 2014, when he had not sold any personally-held Galena stock in the previous four years. Schwartz also is one part of a statistically significant cluster of insider traders. Seven of eleven total insiders traded on material non-public information, and Schwartz was one of the seven. He attended all the board meetings and had access to the same information as the other insiders and acted with the same knowledge or reckless disregard as to the pump and dump scheme. He also made false and misleading statements about the progress of enrollment for the NeuVax™ Phase 3 on October 9, 2013.

   vii. **Loss causation is established with regard to claims against Insider Trading Defendants**

  235. Loss causation is established with respect to the claims against Insider Trading defendants because the Inside Information provided (a) was material, and (b) the Insider Trading Defendants actually used such information in selling Galena stock.

  236. Had the Inside Information been disclosed, Galena stock would have traded at lower prices, and Riley would not have bought shares of Galena stock or stock options, would have delayed purchasing, or would have purchased at lower prices.

  237. Nondisclosure of the Inside Information by Insider Trading Defendants in breach of their duty to disclose or abstain from trading on it therefore caused Riley's economic loss.

  238. Loss causation is further established because the value of Galena securities materially decreased when the Inside Information was later disclosed to the market, as set forth in ¶¶142-162, above.

  239. As a direct result of their illegal sales based on the Inside Information, the Insider Trading Defendants avoided losses suffered by other Galena investors following the disclosure

of (a) the illegal DreamTeam and Lidingo campaigns to pump Galena's stock, including

disclosure of receipt of an SEC subpoena, (b) the FDA's denial of Breakthrough Therapy

designation, (c) Galena's setbacks in attaining enrollment of patients for the Phase 3 trial of

NeuVax™, and (d) Galena's earnings. Following these disclosures, Galena's stock price fell to

$2.82.

240.    Based on the analysis to date, which is ongoing, as a result of the trades

conducted during the Relevant Period, Defendants avoided losses in Galena securities as follows:

   a)  Kriegsman: $2,128,500;

   b)  Ahn: $1,601,497.65;

   c)  Hillsberg: $1,469,500;

   d)  Chin: $489,375;

   e)  Galliker: $408,000;

   f)  Nisi: $1,431,000; and

   g)  Schwartz: $275,000.

### E.  Respondeat superior and agency principles impute liability to the various entities for the actions of the entity's employees and agents.

241.    The scienter of Galena's agent's, including without limitation the Galena Officer

Defendants, the Galena Director Defendants, the DreamTeam Defendants, and the Lidingo

Defendants, is imputed to Galena under the doctrine of respondeat superior and common law

principles of agency. Under these common law principles, Galena is liable for the acts of the

Galena Officer Defendants, Galena Director Defendants, DreamTeam Defendants and their

agents, and Lidingo Defendants and their agents.

242.    Ahn and Bernarda reviewed, edited and approved DreamTeam's published

articles prior to publication. Defendants Ahn and Bernarda approved and adopted these

statements with authority to act on behalf of Galena. Knowledge of the contents of the articles can be imputed to both of them, regardless of who made the specific approval of any article. With regard to the Lidingo Defendants, Ahn reviewed Lidingo's work product (the Special Committee found evidence Ahn had requested copies of Lidingo work product or represented that copies of Lidingo's work product had been sent to him), and knew that Lidingo was paying writers to tout Galena in social media and other outlets. Ahn and Dunlap also knew that Lidingo had received a significant grant of stock options, with 100,000 shares vesting immediately and the remainder vesting over eight months. Ahn's, Bernarda's, and Dunlap's actions were conducted within the scope of their employment with Galena.

243.    Galena both controlled and had the right to control the actions, means, and manner of the DreamTeam Defendants, in that in the DreamTeam Defendants' pursuit of a campaign to boost Galena's stock price, Galena authorized and had the right to authorize each of the promotional articles published by DreamTeam and its agents, including their complete text, and had the right to compel the DreamTeam Defendants to deny that the promotional articles were paid promotions or to require the DreamTeam Defendants to omit such disclosures.

244.    Galena also controlled and had the right to control the actions, means, and manner of the Lidingo Defendants, in that Galena had requested copies of Lidingo's marketing and social media work product and could have terminated Lidingo's social media campaign for Galena, Lidingo's payment of writers, or other Lidingo actions designed to boost Galena's stock price.

245.    The DreamTeam Defendants' and Lidingo Defendants' conduct occurred substantially within the time and space limits authorized by the agency relationship, in that Galena authorized both the DreamTeam and Lidingo campaigns to boost Galena's stock price;

the DreamTeam Defendants and Lidingo Defendants were motivated by a purpose to serve Galena, in that DreamTeam was hired to draft the promotional articles and the text of the promotional articles that were published was approved by Galena, and Lidingo was hired for a social media campaign in exchange for, among other things, stock options, all of which was orchestrated to pump Galena's stock price so that all of the Defendants would benefit.  The fraudulent acts complained of, namely the material misstatements and omissions, and the additional conduct making up the pump and dump scheme, were of a kind that the DreamTeam Defendants and Lidingo Defendants were hired to perform.

246.    All of the wrongful acts complained of herein were carried out within the scope of the Galena Officer Defendants' employment, Galena Directors' agency, DreamTeam Defendants' agency, or Lidingo Defendants' agency, with authorization.

247.    The scienter of the Galena Officer Defendants, Galena Director Defendants, DreamTeam Defendants, and Lidingo Defendants is imputed to Galena under *respondeat superior* and agency principles.

248.    The interests of Galena were aligned with those of the Galena Officer Defendants, Galena Director Defendants, DreamTeam Defendants, and Lidingo Defendants.  Galena stood to benefit from the actions taken by the aforementioned defendants.  Throughout the Relevant Period, Galena sought outside investments to bolster its financial condition. During the Relevant Period, Galena received proceeds of $37.5 million from selling its stock. During the Relevant Period, Galena also earned more than $21 million from the exercise of warrants and options. Defendants' misconduct in promoting Galena stock through DreamTeam and Lidingo allowed Galena to sell its stock to investors at prices higher than it otherwise could have, and in many

cases, absent the unlawful stock promotion, Galena could not and would not have been able to sell its stock and receive the sale proceeds.

249.    In addition, as officers and/or directors of Galena, the Galena Officer Defendants and Galena Director Defendants had apparent authority to speak on Galena's behalf. From the perspective of third parties, it appeared that Galena had entrusted the Galena Officer Defendants and Galena Director Defendants to speak on its behalf.

250.    Riley relied on the accuracy of statements of the Galena Officer Defendants and Galena Director Defendants.

251.    Galena is liable for statements other defendants made when they had apparent authority to make them.

252.    Under *respondeat superior* and agency principles, DreamTeam is liable for the acts of McCarthy and Meyer.

253.    Under *respondeat superior* and agency principles, Lidingo is liable for the acts of Bjorlin and other agents.

## VI. RILEY RELIED UPON DEFENDANTS' FALSE AND MISLEADING STATEMENTS, OMISSIONS, AND MARKET MANIPULATION SCHEME

### A.  Fraud on the Market creates a presumption of reliance.

254.    Riley may rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

    a)   Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

    b)   The omissions and misrepresentations were material;

    c)   Galena's stock traded in an efficient market;

d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Galena's stock; and

e)   Riley purchased Galena common stock and stock options between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

255.   At all relevant times, the market for Galena common stock was efficient for the following reasons, among others:

a)   Galena's shares traded on the NASDAQ;

b)   As a regulated issuer, Galena filed periodic public reports with the SEC;

c)   Galena regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

d)   During the Relevant Period, the average weekly trading volume in Galena's shares as a percentage of its outstanding shares was 4.7%, establishing a very strong presumption that the market for its stock was efficient;

e)   Galena was eligible to file and did file a short-form registration statement with the SEC on Form S-3;

f)   Galena was followed by analysts at Cantor Fitzgerald, Needham & Co., Roth Capital Partners, JMP Securities, Noble Financial Group, Piper Jaffray, MLV & Co., Maxim Group LLC, Oppenheimer & Co., and EVA Dimensions, that issued reports about the Company;

g)   New company specific information was rapidly reflected in the Company's stock price; and

h)   More than one hundred market makers made a market in the Company's stock.

**B.   Riley's individual reliance on defendants' market manipulations and fraudulent statements.**

256.    In addition to, and in the alternative to, demonstrating a presumption of reliance by fraud-on-the-market, Riley can demonstrate how during the Relevant Period he individually relied on defendants' fraudulent statements and the scheme to manipulate the market for Galena stock.

257.    Riley learned of Galena from articles on Seeking Alpha and similar investor media outlets.  Riley also saw Galena mentioned in various penny stock advertisements.

258.    Before making any decisions to invest in Galena, Riley cross-referenced statements promoting Galena on Seeking Alpha and in advertisements with information available in Galena's public statements on its website, particularly information published on its investor relations page, such as press releases, presentations, and SEC filings.

259.    On or around September 23, 2013, Riley typed out notes on Galena on his tablet device that were compiled from Galena's public statements on anticipated catalysts available on its website, in press releases, and at conference presentations.  Many of these statements were also made in DreamTeam articles published before that date on Seeking Alpha.  Riley's notes were titled "Why Galena Will Succeed" and included information about tracking the enrollment numbers for the NeuVax™ Phase 3.  Riley believed Galena's statements that the revenue from the public offering and Abstral® sales would fund the Phase 3, justifying a price increase in the stock.

260.    Riley listened to Schwartz's presentation on Galena at the investor conference on October 9, 2013.  Riley's notes from the presentation documented Schwartz's false statement that the NeuVax™ Phase 3 would complete enrollment by the end of 2013.

261.    Riley viewed Ahn's presentation on Galena at the Piper Jaffrey Healthcare conference, which occurred on or around December 2, 2013.  Riley's notes from the presentation documented Ahn's statement that the NeuVax™ Phase 3 would complete enrollment soon.

262.    Riley viewed Ahn's presentation on Galena at the Noble Financial conference, which occurred on or around January 20, 2014.  Riley's notes from the presentation documented Ahn's statement that the NeuVax™ Phase 3 would complete enrollment soon.

263.    Riley viewed Ahn's presentation on Galena at the Leerink Global Healthcare conference, which occurred on or around February 12, 2014.  Riley's notes from the presentation documented Ahn's statements that Galena had $55 million in the bank and was close to complete enrollment for the NeuVax™ Phase 3.  Riley noted that Ahn used a model rocket analogy and said that Galena had enough "fuel" to get to the end.  Riley also noted that Ahn dismissed the Feuerstein article written the same day, saying it had no merit.

264.    Riley continued to trust and rely on the public statements of Galena and its officers, despite accusations of insider trading in the first quarter of 2014, based on public statements from Galena and its officers.  On or around March 9, 2014, Riley posted a comment to a Seeking Alpha story about Galena that indicated Riley trusted the public statements of Galena and its officers.  Riley's comment evidenced his belief that Galena was running an honorable and professional business.

265.    Riley continued to track Galena announcements, statements, and filings.  For example, Riley viewed the webcast of Galena's corporate update at the Deutsche Bank Health

Conference, which occurred May 7, 2014. Riley noted that Ahn stated that an internal review of Galena's brand awareness campaign and brand awareness campaign found no wrongdoing. Riley also noted that Ahn said over 2500 patients had been screened for the NeuVax™ Phase 3, with enrollment completing before the fall.

266.    It is not reasonable for Riley to know that the DreamTeam articles published to SeekingAlpha and other websites that were reviewed and approved by Galena, Ahn, and Bernarda, were written by paid promoters. It is not reasonable to expect Riley or other small investors to have to research every stock promotion-related website to make sure that each company recommended by purportedly independent analysts and investors has not hired a promotional firm to engage in secret stock promotions.

## VII. DEFENDANTS' CONDUCT CAUSED RILEY'S LOSSES

267.    During the Relevant Period, Riley invested significantly in Galena stock and call options. In addition, a number of Riley's purchases of stock and stock options are contemporaneous with the sales of Insider Trading Defendants. Riley purchased Galena stock or options on multiple occasions on or around the period Insider Trading Defendants dumped stock, from January 17, 2014, until February 12, 2014.

268.    As a result of various defendants false and misleading statements or omissions and the additional manipulative and deceptive conduct associated with the pump and dump scheme, Riley's purchases of Galena securities were at artificially inflated and distorted prices.

269.    Riley has suffered significant economic losses to the value of his Galena stock and call options as a result of defendants' misconduct complained of in this Complaint.

## VIII.   RILEY'S LAWSUIT IS TIMELY

270.    The securities law violations complained of in this Complaint were filed less than two years after Riley discovered or reasonably could have discovered the facts upon which the

claims asserted in this Complaint are based.  In addition, Riley filed this action less than five

years after the date of defendants' misrepresentations and market manipulation scheme took

place.

## IX.    THE STATUTORY SAFE HARBOR DOES NOT APPLY

271.    The statutory safe harbor applicable to forward-looking statements under certain

circumstances does not apply to any of the false and misleading statements pleaded in this

Complaint.  First, the statements complained of in herein were historical statements or statements

of current facts and conditions at the time the statements were made.  Second, the statutory safe

harbor does not apply to statements included in financial statements that purport to have been

prepared in accordance with Generally Accepted Accounting Principles ("GAAP").  Further, to

the extent that any of the false or misleading statements alleged herein can be construed as

forward-looking, the statements were not accompanied by any meaningful cautionary language

identifying important facts that could cause actual results to differ materially from those in the

statements.

272.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any

forward-looking statements pleaded herein, defendants are liable for those false and misleading

forward-looking statements because at the time of each of those statements was made, the

speakers knew the statement was false or misleading, or the statement was authorized or

approved by an executive officer of Galena who knew that the statement was materially false or

misleading when made.

# X. CLAIMS

## FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and**

**Rule 10b-5 Promulgated Thereunder, including subsections 10b-5(a), (b), and (c)**

**(Against Galena, the Galena Officer Defendants, the Dream Team Defendants,**

**and the Lidingo Defendants)**

273.    Riley repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

274.    Throughout the Relevant Period, the defendants named in this first claim individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal paid stock promotion campaigns, to misrepresent the true financial condition of Galena and status of enrollment for the critical NeuVax™ Phase 3 trial, and to conceal adverse material information about the business, operations and future prospects of Galena.

275.    The plan, scheme and course of conduct was intended to and, throughout the Relevant Period, did (1) manipulate and deceive the investing public, including Riley, as alleged herein; (2) artificially inflate or distort the price of Galena securities; and (3) cause Riley to purchase Galena securities at artificially inflated or distorted prices.

276.    In furtherance of this unlawful scheme, plan and course of conduct, several defendants named in this first claim, individually and jointly, consistently made materially false and misleading statements and omitted to state material facts regarding Galena's paid stock promotion campaigns, the true financial condition of Galena and status of enrollment for the critical NeuVax™ Phase 3 trial, and the business, operations and future prospects of Galena. The "makers" of false and misleading statements are specifically identified in the allegations

above and summarized here as: Ahn, Bernarda, and Galena for the false and misleading articles

published through Galena's relationship with DreamTeam; Ahn and Galena for false and

misleading statements contained in Galena's September 2013, 2013 8-K filing and Galena's

2013 third quarter 10-Q/A; Galena for the statements contained in the September 13, 2013

prospectus; Ahn and Schwartz for false and misleading statements regarding the enrollment

numbers and status of the NeuVax™ Phase 3 trial.

277.    The defendants named in this first claim schemed to manipulate the price of

Galena securities and deceive the investing public including Riley not only through the mere

publication of bullish articles containing false and misleading statements about the paid

promotion; defendants also schemed to manipulate the price of Galena securities by creating a

cacophony of voices, including the provision of third parties to link to them and endorse such

articles (without disclosure of the paid promotional campaign), message board aliases and cyber

shills to cite to and promote the articles and shout down critical articles (without disclosure of the

paid promotional campaign), and even the execution of Galena stock options (increasing the

volume of stock traded and the perception of high demand).  Galena and Galena Officer

Defendants deceptively used DreamTeam Defendants and Lidingo Defendants to serve as

mouthpieces in an effort to conceal the company and its insiders' direct involvement in the stock

manipulation scheme.

278.    While in possession of material, adverse non-public information, the defendants

named in this first claim (a) employed devices, schemes, and artifices to defraud; (b) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; (c) sold shares while in possession of material, adverse non-public

information; and (d) engaged in acts, practices and a course of conduct which operated as a fraud

and deceit upon purchases of Galena's securities in an effort to inflate or distort the price of

Galena securities.  Each of the defendants named in this first claim was a direct, necessary and

substantial participant in the common course of conduct and scheme alleged herein.

279.    The defendants named in this first claim carried out the deliberate scheme to

inflate or distort the price of Galena.  Such defendants knew or, but for their deliberate

recklessness, should have known, that their statements and omissions concerning Galena's paid

stock promotion campaigns, the true financial condition of Galena and status of enrollment for

the critical NeuVax™ Phase 3 trial, the FDA denial of Breakthrough status, and the business,

operations and future prospects of Galena were materially misstated and misleading.  Further,

defendants named in this first claim knew of existing adverse facts which undermined their

representations about Galena's business operations and prospects during the Relevant Period.

280.    The defendants named in this first claim acted with scienter through the Relevant

Period.  Such defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth in the paragraphs above, or acted with reckless disregard of the truth in

that they failed to ascertain and to disclose such facts, even though such facts were available to

them.  The material misrepresentations and/or omissions made by the defendants named in this

first claim were done knowingly or recklessly and for the purpose and effect of concealing

Galena's financial condition from the investing public.

281.    In addition to having actual knowledge and/or recklessly disregarding the

fraudulent nature of their statements and conduct, each of the defendants named in this first

claim had a strong motive to engage in the deceptive scheme.  Inflating or distorting its stock

price was essential to Galena's ability to raise funds from investors.  Inflating or distorting

Galena's stock was a key metric for the DreamTeam Defendants' and the Lidingo Defendants'

campaigns for Galena.  Bonuses or incentive compensation available to the Galena Officer

Defendants were heavily dependent on meeting financial metrics, including stock price and

raising investor funds from secondary offerings.  Inflating or distorting Galena's stock price

provided value to the Galena Officer Defendants' holdings of Galena shares.  Disclosure of the

true facts about Galena's paid stock promotion campaigns, the true financial condition of Galena

and status of enrollment for the critical NeuVax™ Phase 3 trial, and the business, operations and

future prospects of Galena would have seriously impaired Galena's position in the

biopharmaceuticals' marketplace.

      282.    Defendants named in this first claim are liable as direct participants in the wrongs

complained of herein.  Defendants had the ability to, and did in fact, control the content of public

statements disseminated about Galena.  Each of the defendants against whom Claim One is

asserted has directly engaged in "scheme" conduct that resulted in misleading information being

disseminated to the public and artificially inflating Galena's stock price.  For example,

DreamTeam, McCarthy, Meyer, Bjorlin, and Lidingo hired authors to draft articles and other

promotional materials, sent or caused to be sent promotional emails, and posted or caused to be

posted information on social media designed to tout Galena, inflate Galena's stock price, or call

attention to other aspects of the alleged promotional scheme.  DreamTeam, McCarthy, and

Meyer played a critical role in getting the articles drafted and published by coordinating with

authors, websites, and Galena.  Meyer drafted some of the false and misleading articles.

DreamTeam, McCarthy, Lidingo, and Bjorlin also allegedly marketed themselves as having

strong relationships with key investor websites such as *Seeking Alpha* that enabled them to get

articles published on those websites. Without them serving as intermediaries between Galena,

authors, and investor websites, the articles likely would not have been published. Galena, Ahn,

and Bernarda hired Lidingo and DreamTeam and approved the articles.  Galena and Ahn caused public statements to be filed in certain publicly-filed documents.  These are direct actions that caused certain false or misleading information to be publicly disseminated into the marketplace and artificially inflate Galena's stock price.

283.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Galena common stock and call options were artificially inflated during the Relevant Period.  In ignorance of the fact that market prices of Galena securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants named in the First Claim, or upon the integrity upon the market in which the Galena securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants named in this First Claim during the  Relevant Period, Riley acquired Galena common stock and call options during the Relevant Period at artificially high prices and was damaged.

284.    At the time of said misrepresentations and omissions, Riley was ignorant of their falsity, and believed the false statements to be true.   Had Riley known about the paid stock promotion campaigns, the true financial condition of Galena and status of enrollment for the critical NeuVax™ Phase 3 trial, and the real business, operations, and future prospects of Galena, Riley would not have purchased Galena common stock or call options at all, or would not have done so at the artificially inflated prices that they paid.

285.    The materially false and misleading statements and omissions of material fact of the defendants named in this First Claim caused Riley to suffer losses in connection with his investments in Galena stock and call options.  Galena's stock price collapsed as the truth was

revealed over time regarding the stock promotion campaigns with Dream Team and Lidingo, the true financial condition of Galena and status of enrollment for the critical NeuVax™ Phase 3 trial, and the real business, operations and future prospects of Galena.

286.    By reason of the foregoing, the Defendants named in this First Claim violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Riley for damages suffered in connection with purchases of Galena stock and call options during the Relevant Period.

**SECOND CLAIM**

**Violation of Section 20(a) of the Exchange Act**

**(Against Galena Officer Defendants with respect to Galena's primary 10b-5 violations)**

**(Against McCarthy with respect to DreamTeam's primary 10b-5 violations)**

287.    Riley repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

288.    As set forth above, Galena and DreamTeam each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by making false and misleading statements and omissions and carrying out a manipulative and deceptive scheme to pump up Galena stock.

289.    By virtue of their respective high-level and supervisory positions, agency, ownership and contractual rights, active participation in and/or awareness of the day-to-day operations of Galena, and/or intimate knowledge of false statements made by Galena in filings with the SEC, by Galena officers through media channels, or by DreamTeam on third party websites, social media, and message boards, Galena Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Galena, including the content and dissemination of the various false and misleading

Page 93 – COMPLAINT

statements and the additional conduct constituting a deceptive and manipulative scheme.  Galena Officer Defendants were provided with or had unlimited access to copies of Galena's reports, press releases, public filings, and statements made by Galena employees and agents working in association with DreamTeam alleged by Riley to have been false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of statements or to cause the statements to be corrected.

290.    By virtue of their respective high-level and supervisory positions, agency, ownership and contractual rights, active participation in and/or awareness of the day-to-day operations of DreamTeam and/or MissionIR, and/or intimate knowledge of false statements made by DreamTeam and/or MissionIR on third party websites, social media, and message boards, McCarthy had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of DreamTeam and MissionIR, including the content and dissemination of the various false and misleading statements and the additional conduct constituting a deceptive and manipulative scheme.  McCarthy was provided with or had access to copies of DreamTeam agent's work for the Galena campaign and had the ability to prevent the issuance of statements or to cause the statements to be corrected.

291.    By virtue of their positions as controlling persons, defendants named in this second claim are liable pursuant to Section 20(a) of the Exchange Act.

292.    As a direct and proximate result of defendants' wrongful conduct, Riley suffered damages in connection with purchases of Galena common stock and call options during the Relevant Period.

## THIRD CLAIM

### Violation of Section 20A of the Exchange Act

### (Against the Insider Trading Defendants)

293.     Riley repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

294.     The Insider Trading Defendants violated Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, by contemporaneously purchasing and selling Galena securities while in possession of the Inside Information.

295.     During the Relevant Period the Insider Trading Defendants occupied positions within Galena that made them privy to highly confidential information about Galena's operations, finances, financial condition and prospects, including, but not limited to the Inside Information.  The Inside Information provided to the Insider Trading Defendants was, in each case, material and nonpublic.

296.     By virtue of possessing the Inside Information, the Insider Trading Defendants directly or indirectly made material omissions in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange.  In addition, by engaging in additional conduct to conceal the market manipulation, the Insider Trading Defendants directly or indirectly used the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange to employ devices, schemes, and artifices to defraud and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who purchased Galena securities contemporaneously with the sale of such stock

by the Insider Trading Defendants.  The Insider Trading Defendants thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

297.    Riley contemporaneously purchased and sold Galena securities of the same class as those sold and purchased by the Insider Trading Defendants.

298.    Riley suffered damages because, in reliance on the integrity of the market, and by his own investigation of statements regarding Galena catalysts by Galena and its agents, he paid artificially inflated prices as a result of the violations of Section 10(b) and 20(a) of the Exchange Act as alleged herein.  Riley would not have purchased the Galena securities at the prices he paid, or at all, if he had been aware that the market prices had been artificially inflated by the defendants' false and misleading statements and concealment of the paid promotion campaign, among other things.  At the time of the purchases of Galena purchases by Riley, the fair and true market value of the securities was substantially less than the price paid by Riley.

299.    Riley is entitled to disgorgement of the unlawful gains made by the Insider Trading Defendants.

## FOURTH CLAIM

### Violation of Section 10(B) of the Exchange Act and SEC Rule 10b-5

### (Against the Insider Trading Defendants)

300.    Riley repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

301.    During the Relevant Period the Insider Trading Defendants occupied positions within Galena that made them privy to highly confidential information about Galena's operations, finances, financial condition and prospects, including, but not limited to the Inside

Information.  The Inside Information provided to the Insider Trading Defendants was, in each case, material and nonpublic.

302.    By virtue of possessing the Inside Information, the Insider Trading Defendants directly or indirectly made material omissions in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange.  In addition, by engaging in additional conduct to conceal the market manipulation, the Insider Trading Defendants directly or indirectly used the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange to employ devices, schemes, and artifices to defraud and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who purchased Galena securities contemporaneously with the sale of such stock by the Insider Trading Defendants.  The Insider Trading Defendants thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

303.    Riley contemporaneously purchased and sold Galena securities of the same class as those sold and purchased by the Insider Trading Defendants.

304.    Riley suffered damages because, in reliance on the integrity of the market, and by his own investigation of statements regarding Galena catalysts by Galena and its agents, he paid artificially inflated prices as a result of the violations of Section 10(b) and 20(a) of the Exchange Act as alleged herein.  Riley would not have purchased the Galena securities at the prices he paid, or at all, if he had been aware that the market prices had been artificially inflated by the defendants' false and misleading statements and concealment of the paid promotion campaign, among other things.  At the time of the purchases of Galena purchases by Riley, the fair and true market value of the securities was substantially less than the price paid by Riley.

305.    Riley is entitled to disgorgement of the unlawful gains made by the Insider Trading Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Riley prays for relief and judgment, as follows:

1)    Awarding Riley compensatory damages against all of the Defendants, jointly and severally, for all losses and damages suffered as a result of Defendants' wrongdoing alleged in this Complaint, in an amount to be determined at trial;

2)    Awarding Riley pre-judgment and post-judgment interest, as well as reasonable attorney fees, expert witness fees and other costs;

3)    Awarding Riley punitive and exemplary damages;

4)    And awarding Riley such other relief as this Court may deem just and proper.

## JURY DEMAND

Riley demands a jury trial as provided by FRCP 38(a).

DATED:  September 15, 2015.


LARKINS VACURA LLP
/s/ Christopher J. Kayser
**Christopher J. Kayser** OSB No. 984244
cjkayser@larkinsvacura.com
**John Rake** OSB No. 105808
jrake@larkinsvacura.com
**LARKINS VACURA LLP**
121 S.W. Morrison St., Suite 700
Portland, Oregon 97204
Telephone:  503-222-4424
Facsimile:  503-827-7600
Attorneys for Plaintiff